UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION


UNITED STATES OF AMERICA,   ) CASE NO:  4:17-CR-00105-ALM-KPJ-1
                            )
              Plaintiff,    )            CRIMINAL
                            )
     vs.                    )          Sherman, Texas
                            )
DEREK MYLAN ALLDRED,        )    Wednesday, September 27, 2017
                            )
              Defendant.    )     (10:14 a.m. to 10:41 a.m.)


DETENTION HEARING

BEFORE THE HONORABLE CHRISTINE A. NOWAK,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:              WILLIAM TATUM, ESQ.
                           U.S. Attorney's Office - Plano
                           101 East Park Blvd
                           Suite 500
                           Plano, TX 75074

For Defendant:             ROBERT ARRAMBIDE, ESQ.
                           Federal Public Defender's Office
                           600 E. Taylor, Suite 4000
                           Sherman, TX 75090

Court Reporter:            Recorded; Digital

Courtroom Deputy:          Keary Conrad

Transcriber:               Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| MICHAEL ELKHEIR | 5 | 17 | 20 |

ARGUMENT

BY MR. TATUM        22

BY MR. ARRAMBIDE    24

RULING        26

1      **Sherman, Texas; Wednesday, September 27, 2017; 10:14 a.m.**

2                          **(Call to Order)**

3              **THE COURT:**  All right.  At this time, the Court will

4    call its next cause.  Cause Number 4-17-CR105, the *United*

5    *States of America versus Derek Mylan Alldred*.  If I can have an

6    appearance on behalf of the Government.

7              **MR. TATUM:**  William Tatum for the Government.

8              **THE COURT:**  And appearance on behalf of Mr. Alldred?

9              **MR. ARRAMBIDE:**  Robert Arrambide for Mr. Alldred,

10   Your Honor.

11             **THE COURT:**  Thank you.  And, Mr. Alldred, can you

12   please state your full name for my record?

13             **DEFENDANT ALLDRED:**  Derek Mylan Alldred.

14             **THE COURT:**  And Mr. Alldred, the last time that we

15   were together, you told me you spoke and understood English and

16   that you didn't require the services of an interpreter.  Does

17   that remain the case today, sir?

18             **DEFENDANT ALLDRED:**  Yes, ma'am.

19             **THE COURT:**  All right.  Now, we are scheduled today

20   to proceed on the motion to reopen detention hearing.  Now, let

21   me just confirm that the Government does persist in its desire

22   to detain.

23             **MR. TATUM:**  That is correct, Your Honor.

24             **THE COURT:**  And Mr. Arrambide, you and your client

25   persist in your request to reopen and to have a full detention

4

1  hearing; is that correct?

2          **MR. ARRAMBIDE:**  That's correct, Your Honor.

3          **THE COURT:**  Now, let me go ahead and ask before we

4  proceed then.  The Court has reviewed the pretrial services

5  report issued in this case.  Have both parties also had an

6  opportunity to review the pretrial services report.  Mr. Tatum?

7          **MR. TATUM:**  Yes, Your Honor.

8          **THE COURT:**  And Mr. Arrambide?

9          **MR. ARRAMBIDE:**  Yes, Your Honor.

10          **THE COURT:**  And other than any errors or omissions

11  that you would bring out through evidence or cross-examination

12  today, are there any items that either of you would care to

13  draw to the Court's attention from that report?

14          **MR. TATUM:**  No, Your Honor.

15          **MR. ARRAMBIDE:**  No, Your Honor.

16          **THE COURT:**  So, no corrections.  Mr. Tatum, can you

17  confirm for me, is this a presumption case?

18          **MR. TATUM:**  No, it is not.

19          **THE COURT:**  And does the defense concur that the

20  presumption is not applicable in this case?

21          **MR. ARRAMBIDE:**  We do, Your Honor.

22          **THE COURT:**  At this time then, the Government may

23  call its first witness.

24          **MR. TATUM:**  The Government will call Agent Mike

25  Elkheir.

1      **MICHAEL ELKHEIR, GOVERNMENT'S WITNESS, SWORN**

2           **THE COURT:**  Mr. Tatum, you may proceed.

3           **MR. TATUM:**  Thank you, Your Honor.

4                          **DIRECT EXAMINATION**

5   BY MR. TATUM:

6   Q     Would you please state your name?

7   A     My name is Michael Elkheir, E-L-K-H-E-I-R.

8   Q     How are you employed?

9   A     With the United States Naval Criminal Investigative

10  Service.

11  Q     Are you the agent on the case concerning Derek Mylan

12  Alldred?

13  A     I am.

14  Q     And can you tell the Court, when did you become involved

15  in the investigation of Mr. Alldred, and how did that begin?

16  A     Our office received a phone call from The Colony Police

17  Department in regards to what was described as a Stolen Valor

18  case.  I met with a detective at The Colony Police Department

19  after that to discuss what the nature of the allegation was and

20  what one of her victims had reported about the defendant.

21  Q     And when you met with the detective, did the detective

22  provide you with any evidence concerning that allegation, or

23  was that not until you met with the first victim?

24  A     The detective provided me with a bunch of evidence as well

25  as when I met with other victims.  They provided further

1   evidence.

2   Q     Did you interview the victim in this case?

3   A     I did.

4   Q     And what did she tell you about the defendant?

5   A     She stated that she met the defendant on an online dating

6   website and the defendant purported himself as a naval officer

7   and a PhD professor at SMU University.

8   Q     And when you met with the victim, did she provide you with

9   any of the various identification documents that the defendant

10  provided her?

11  A     Yes.  She had provided uniforms, false Geneva Convention

12  ID cards, counterfeit NCIS special agent badges, and pictures

13  that was on her iPad cloud account that the defendant had used

14  while staying at her residence.

15  Q     And let's talk about that for a minute.  Did the defendant

16  -- I'm sorry.  Did the victim describe to you the relationship

17  with the defendant, what it turned into and how long it had

18  lasted?

19  A     She did.

20  Q     How did she describe it?

21  A     She said it began -- it turned into a romantic

22  relationship until she determined that the defendant was lying

23  to her about his identity as well as stealing from her from her

24  residence.

25  Q     And during this time, did the defendant stay at her

1   residence?

2   A    He did.

3   Q    Where is that residence located, what city?

4   A    The Colony, Texas.

5   Q    Is that within the Eastern District of Texas?

6   A    It is.

7   Q    Did the victim relate to you, how did she discover that

8   the defendant was stealing from her?

9   A    She received an alert from one of her credit card

10  companies stating that there was a significant amount of

11  purchases on the card.  Initially she did not believe that the

12  defendant had committed that because of his trustworthiness,

13  and due to the nature of his employment in the military.

14       After receiving another card, she received another

15  fraud alert from another card a few weeks later, and when she

16  suspected the defendant, she went on to her iPad which the

17  defendant was using.  He forgot to sign out of his cloud

18  account, and what she knew him as Richard Taylor, she found out

19  it was actually Derek Alldred.

20  Q    And after you received those allegations, were you able to

21  do an investigation of the theft concerning the credit cards?

22  A    I was.

23  Q    And were you able to determine how the credit cards were

24  used to commit the theft?

25  A    The defendant was using them via eBay, making online

Elkheir - Direct / By Mr. Tatum                          8

1   purchases and making purchases around the Metroplex, the DFW

2   Metroplex, at various establishments.

3   Q    Now, the online purchases that the defendant had made, did

4   those involve shipping items to the residence in The Colony,

5   Texas?

6   A    It did.

7   Q    And did the victim have possession of shipping labels and

8   other various items that showed that items were shipped to her

9   address by the defendant?

10  A    When the defendant was staying there, he was hiding the

11  shipping labels in the garage and the victim was able to locate

12  those shipping labels in the garage.

13  Q    Did you also get records from PayPal and eBay?

14  A    I did.

15  Q    And did they show that the victim's credit card had been

16  tied to the accounts used by the defendant to purchase those

17  items and ship them?

18  A    It did.

19  Q    Now during -- or when you talked to the victim, did the

20  victim describe to you and incident in which the defendant

21  possessed a firearm of hers?

22  A    She did.

23  Q    What did she tell you?

24  A    She stated that the defendant also stated that he was an

25  agent for the Navy and that he wanted to borrow a holster, and

1    that he borrowed a holster from her, and during a text message

2    conversation, she stated to him that she had left one of her

3    guns in the car, and he stated to her that it was okay, that he

4    had his badge with him.

5    Q    During this relationship between the victim and the

6    defendant, did she tell you whether or not he would wear his

7    uniform in public or present himself as a military person to

8    other individuals?

9    A    She did.

10   Q    How did she describe that?

11   A    He would normally show up at a certain bar, McSwiggan's

12   Bar in The Colony, in full dress uniform, full naval dress

13   uniform, and she'd often pick him up or meet him while he was

14   wearing a naval flight suit, because he also purported himself

15   to be an F-18 pilot.

16   Q    Where was she picking him up when he was wearing the

17   flight suit?

18   A    She'd picked him up at the airport, she'd picked him up at

19   the bar, she picked him up at various places in the Metroplex.

20   Q    Now, during your investigation, were you able to

21   investigate the employment history of the defendant?

22   A    I was.

23   Q    Were you able to determine whether or not the defendant

24   was in fact ever in the military, or a college professor, or a

25   naval agent?

1   A    I was; even during the course of my interview with him, he

2   admitted to me that he never was a -- in the military, a naval

3   officer, an F-18 pilot, a NCIS special agent, or law

4   enforcement officer, an attorney, or a PhD professor.

5   Q    Now during the time you were doing this investigation, and

6   after you talked to victim one, did you also interview another

7   victim during this same time period that was also in a

8   relationship with the defendant?

9   A    I did.

10  Q    What was she able to tell you about how she met the

11  defendant and during what time period it was?

12  A    It was the same time period as when victim one had met the

13  defendant and she stated she also met him on an online dating

14  website and had initially met him at an establishment at

15  Grapevine, Texas, and that he was well dressed and played the

16  part as an SMU PhD professor.

17  Q    Was she able to describe the length of her relationship

18  with the defendant and how she determined he in fact was not

19  the person he was purporting to be, the PhD professor?

20  A    When I had interviewed the second victim, she thought that

21  something was up in terms of how the defendant was acting at

22  her residence and being evasive, and then the fact that she

23  thought it was odd that they would stay at Airbnb's every

24  weekend and not at his place, and he would insist on staying at

25  those locations (indiscernible); his own place that he said he

1   had.

2   Q    And did that victim tell you if she had ever actually seen

3   an actual residence for the defendant?

4   A    She never has.

5   Q    And was that the same for victim one and victim two?

6   A    That's correct.

7   Q    Now, victim two, did the defendant introduce himself as

8   Richard Taylor as well?

9   A    Yes.

10  Q    And did she state if the defendant ever carried around any

11  sort of badges or ID cards on himself showing him to be in the

12  military or anything like that?

13  A    She stated yes.

14  Q    Now how did victim two determine that the defendant was in

15  fact Derek Mylan Alldred and not Richard Taylor?

16  A    She did a -- she was contacted by victim one, and she also

17  did a Google search of the defendant and found out his real

18  identity.

19  Q    Now, at any point during your investigation did you

20  interview the defendant in this case?

21  A    I did.

22  Q    And could you please point at him in the courtroom,

23  describe an article of clothing he's wearing, the person you

24  know as Derek Mylan Alldred?

25  A    He's sitting to the left of defense counsel wearing a blue

Elkheir - Direct / By Mr. Tatum                    12

1   jumpsuit and black glasses.

2            **MR. TATUM:**  Your Honor, will the record reflect the

3   witness has identified the defendant by describing where he is

4   seated and describing an article of clothing?

5            **THE COURT:**  The record shall so reflect.

6   **BY MR. TATUM:**

7   Q    Now, when you interviewed the defendant, did you provide

8   him with his *Miranda* whites -- rights, sorry?

9   A    I did.

10  Q    And did he waive those rights?

11  A    He did.

12  Q    What did the defendant state to you about this offense?

13  A    In which regard?  I apologize.

14  Q    I'm sorry.  We'll start with the counterfeit items that

15  were discovered, the badges and identification cards.  What did

16  he tell you about those?

17  A    He stated those were just souvenirs and he got those for

18  fun.

19  Q    Did he tell you why he had come to Texas?

20  A    Just to start a new life.

21  Q    And did he admit whether or not he had ever served in the

22  military, was a pilot, or was any sort of law enforcement

23  officer or professor?

24  A    He did.  He stated to me that he never served in the

25  military or was -- served or occupied at any of those

1    professions.

2    Q    Now concerning the wearing of the military uniform, did

3    the defendant admit that he had worn a uniform recently?

4    A    He did not say recently.  He said it had been at least a

5    year or two for the last time he could remember wearing a

6    military uniform.

7    Q    So, in his statement to you, it wasn't that he had just

8    recently been out in The Colony wearing his uniform, but that

9    it had been over a year ago?

10   A    Correct.

11   Q    And did you determine that statement to be false?

12   A    I did.

13   Q    Now during your investigation, after you talked to victim

14   one and victim two, did you later become aware of other victims

15   throughout the United States?

16   A    I did.

17   Q    And how did that happen?

18   A    I was contacted by a few of them via email in reference to

19   a support group of victims of the defendant.

20   Q    And when you say support group, where is this support

21   group?

22   A    It's an online support group that victims of the defendant

23   had created in order to track and alert other people around the

24   country of the defendant's activities.

25   Q    Now, in which other states do you know of has this same

1   activity occurred?

2   A     Per my investigation, California, Arizona, Nevada,

3   Minnesota.  And Hawaii, I apologize.  And Hawaii.

4   Q     Are there victims from each of those states?

5   A     There is, to my knowledge.

6   Q     Now, looking at -- or I'm sorry.  From talking to those

7   individuals in those states, can you describe in general what

8   the nature of the conduct is involving this defendant and those

9   victims?

10  A     He also met them through online dating websites,

11  purporting himself to be somebody that he wasn't and gained

12  trust with the victims.

13          In those cases, he had moved in with most of the

14  victims and stole their identity, destroyed their credit, one

15  of which today lives out of her vehicle in Minnesota.

16  Q     Now, in each of those cases, were those victims able to

17  determine that he in fact was not the person he was telling

18  them he was?

19  A     That's correct.

20  Q     And when they were able to do that, what usually did the

21  defendant do at that point?

22  A     He ran.

23  Q     Now, during your investigation, have you had an

24  opportunity also to look at the criminal history of this

25  defendant?

1    A    I have.

2    Q    And were you able to see that he has convictions for theft

3    and for burglary?

4    A    I have.

5    Q    Did he also have any convictions for impersonating either

6    peace officers or other public servants?

7    A    I believe in California he was impersonating a Fire

8    Battalion Chief in California, or at least there was an arrest

9    involving that.

10   Q    Did he also have a conviction for false identification to

11   a peace officer?

12   A    Yes.

13   Q    And for burglary?

14   A    Yes.

15   Q    Do you know if he's had a conviction in the past for

16   failure to appear?

17   A    He has.

18   Q    And are there any specific, I say specific, are there any

19   arrest warrants out for the defendant at this time, active

20   arrest warrants?

21   A    I believe one out of Minnesota and one out of Arizona.

22   Q    Do you know what those are for?

23   A    I believe one's a failure to appear out of Arizona, and

24   the one in Minnesota, I'm not too sure at this point.

25   Q    Did you notice in the defendant's criminal history if he'd

1    ever had a protective order issued against him?

2    A    He did.

3    Q    And do you know what that was for?

4    A    That was for a domestic incident involving one victim in

5    California that he was living with.

6    Q    One of the victims of his fraudulent activities?

7    A    That's correct.

8    Q    And do you know if there is an active warrant concerning

9    that protective order?

10    A    I don't.  I don't recall.

11    Q    Now, you've talked to the other victims in this case,

12    correct?

13    A    I have.

14    Q    And you've also, of course, just testified about your

15    interviews with victim one and victim two in this case.  The

16    two victims in this case and the other victims around the

17    country, have they expressed to you whether or not they fear

18    the defendant?

19    A    They have.

20    Q    Can you tell us what they have stated?

21    A    They stated that he knows exactly where they live, he's

22    had access to their children while he was staying at the house

23    there, and even during some of the course of their

24    relationship, he had threatened them different times through

25    their relationship, and they were scared that he can come back

1    and come back to the residence.

2              **MR. TATUM:**  Pass the witness, Your Honor.

3              **THE COURT:**  Thank you.  Mr. Arrambide?

4                        **CROSS EXAMINATION**

5    **BY MR. ARRAMBIDE:**

6    Q    Special Agent, I think you and I may be the only two

7    people who have ever uttered the word "vice" in the context in

8    which you uttered it in this court today.  So, let me ask you,

9    these threats, previously he has never harmed anyone.  He has

10   no violence in his past.  Is that a fair statement?

11   A    Are you talking about -- sorry, in terms of a conviction

12   or in terms of some of the allegations?

13   Q    In terms of convictions, he has never been convicted for

14   any assaults of anyone?

15   A    No, sir.

16   Q    Okay.  And so, these alleged threats from victim one and

17   victim two, that would be relatively new information; is that

18   correct?

19   A    Yes, sir.

20   Q    Okay.  So, so far, whenever he was allegedly discovered,

21   he would just take off; is that correct?

22   A    Correct.

23   Q    Okay.  Now, with regard to those allegations, assuming

24   they're all true, so, for this morning's purposes, we'll assume

25   that's all true.  All of those things required that he have

1    access to individuals; is that correct?

2    A     Yes, sir.

3    Q     That those individuals would trust him enough to bring him

4    into their lives; is that correct?

5    A     Yes, sir.

6    Q     That they would share certain personal information with

7    him so that he could use the information; is that right?

8    A     Yes, sir.

9    Q     And that in fact some of them let him live with them; is

10   that right?

11   A     Yes, sir.

12   Q     Okay.  And so, if he's not able to do any of those things,

13   for instance, if he's placed in a restrictive location, he's

14   not able to do any of those things that they accuse him of; is

15   that right?

16   A     Their fear is that, that he has access and stole their

17   identity, so he knows their Social Security numbers and date of

18   births, and knows where they live, and if he does flee custody,

19   that he could potentially come back.  That was the fear that

20   was stated to me, sir.

21   Q     Okay.  So my -- but my question was, so long as he's in a

22   restrictive environment, he can't do those kinds of things to

23   other people, right?

24   A     Correct.

25   Q     In fact, if he's in a restricted environment, he can't do

1   anything with the information from the previous victims he

2   already possesses, can he?

3   A     No, sir.

4   Q     And with regard to the active warrants, is it your

5   understanding that neither Minnesota nor Arizona wishes to

6   extradite him on those warrants at this time?

7   A     That's correct.

8   Q     So, if the Court were to release him here in Texas, he

9   wouldn't automatically be extradited to either Arizona or

10  Minnesota; is that correct?

11  A     That's correct, yes, sir.

12  Q     With regard to him possessing a firearm, when -- in that

13  text message string that you observed, there's no indication

14  that he actually physically possessed a firearm other than

15  constructively possessing it in a vehicle that he was riding

16  in; is that correct?

17  A     That's correct.

18  Q     You have no indication that he's ever gone out and sought

19  to purchase firearms?

20  A     The only other time was that the second victim witnessed

21  him pull out a firearm at an Airbnb that they were staying at.

22  Q     Okay.  Is there any indication whether that was the same

23  firearm that victim number one had?

24  A     Yes.

25  Q     Now, my other question -- well my first question was,

1    there's no indication he's gone out and sought to purchase

2    firearms?

3    A    Correct, yes, sir.

4    Q    Okay.  Whenever he's fled, he has not used any violent

5    means to flee; is that your understanding?

6    A    Yes, sir.

7    Q    So, he's always just left peacefully.  He doesn't beat

8    anybody up, he doesn't tie them up, kidnap them or otherwise

9    restrain them so that they can't tell on him or report to the

10   police?

11   A    Not that I'm aware of, sir.

12            **MR. ARRAMBIDE:**  Your Honor, I'll pass the witness.

13            **THE COURT:**  Thank you, Mr. Arrambide.  Mr. Tatum,

14   anything further?

15            **MR. TATUM:**  Yes, Your Honor.

16                     **REDIRECT EXAMINATION:**

17   **BY MR. TATUM:**

18   Q    If we could just clarify, when I talked about the assault

19   allegation, I just want to make sure we have it tied down to

20   the right victim.  This in fact was one in, is it California?

21   Is that correct?

22   A    That's correct.

23   Q    Okay.  And what was the nature of that assault when you

24   talked to that victim?

25   A    He'd shoved her and he threw his drink at the victim

1    multiple times, and where she sought out a temporary protective

2    order against him, the defendant.

3    Q    And did you see photographic evidence of a bruise on one

4    of the victims?

5    A    I don't recall.

6    Q    Now, as far as the victim number two, I'd forgotten to

7    cover that with you.  Can you tell the Court about the

8    statement from victim number two about possessing the firearm?

9    A    She stated to me that while they were staying at an

10   Airbnb, the defendant pulled out a handgun and placed it on a

11   mantle on the fireplace inside the Airbnb.  And when she asked

12   defendant, "What's that for?", he said that that's Navy issued.

13             **MR. TATUM:**  I'll pass the witness, Your Honor.

14             **THE COURT:**  Anything further, Mr. Arrambide?

15             **MR. ARRAMBIDE:**  Not for this witness, Your Honor.

16             **THE COURT:**  All right.  Thank you.  You may step

17   down.

18      **(Witness steps down)**

19             **THE COURT:**  Does the Government have any further

20   witnesses to present?

21             **MR. TATUM:**  No, Your Honor.

22             **THE COURT:**  Mr. Arrambide, do you have any witnesses

23   to present?

24             **MR. ARRAMBIDE:**  No, Your Honor.  No witnesses.

25             **THE COURT:**  All right.  Then at this time, the Court

1    will entertain argument.  Mr. Tatum.

2         **MR. TATUM:**  Yes, Your Honor.  Looking at this case,

3    Your Honor, as far as flight risk, before we even get into the

4    evidence of this case, just looking at the defendant's criminal

5    history, he has a history of fraud; of lying.  He has

6    burglaries, thefts, and looking at the different places he's

7    been convicted, it really shows you how he works.

8         He is convicted of these fraud charges, of these

9    thefts, these burglaries, and then he moves on to a different

10   state such that as the agent has testified, he's looking at

11   California, Arizona, Minnesota, multiple states where this

12   fraudulent conduct, the same fraudulent conduct, has occurred

13   and when the defendant's caught, he just flees and runs.

14        The defendant doesn't appear to have any permanent

15   address; just looking at the pretrial services report and then

16   hearing from the statements made by the victims, they never saw

17   his actual residence, no matter what.  It appears that what he

18   does is move in with the victim and then have another victim

19   and really just switch between the two households, go out on

20   whatever trip he's supposed to be on when he's actually seeing

21   the second victim in the case.  Neither of them have ever

22   stated they ever saw an actual residence that this defendant

23   lives in.

24        And as far as his employment, when you look at the

25   pretrial services report, there were several companies listed

1   for temporary, that he temporarily was employed at, but you can

2   never get any verification whether or not he ever actually

3   worked there.  As far as actual employment, it doesn't appear

4   that he ever had any.  It appears that he just shows up,

5   purports to be a professor, a pilot, any sort of employment and

6   during that time is using the victim's credit cards to fund

7   whatever he's doing at the time.

8           Now as far as public safety is concerned, listening

9   to the facts of this case, this defendant used fraud to get

10  into these people's lives, and he's done it across the nation

11  as the agent has testified.  He's gotten close to them, close

12  to their children, and close to their firearms.

13          Just as the agent said, he knows everything about

14  them, and they are scared when he gets out he could easily come

15  back and find them.

16          I know the defendant is saying that he's not going to

17  do that, but as we've learned from the testimony, it appears

18  that he will say anything to get what he wants, because that's

19  what he's done all across this nation.

20          I think the fact that the defendant also has failure

21  to appear, an active warrant, and has a conviction from a court

22  -- courts that have told him he needs to be somewhere and he

23  didn't show up.  He just ran.  I think that goes straight

24  towards his intent and his attitude.  He will of course sit

25  here today and say, "Yes, I'm going to abide by the conditions

24

1    of this Court".

2         This defendant, I believe, is not a good person or a

3    good -- does not have a good history and does not have a good

4    intent to be out on pretrial release, and we agree with the

5    recommendation in the pretrial services report that he be

6    detained.

7         **THE COURT:**  Thank you.  Mr. Arrambide?

8         **MR. ARRAMBIDE:**  Well, Your Honor, certainly not

9    having a permanent address in the area is no impediment to this

10   Court granting a pretrial release.  There is a place that he

11   can go; we have identified the Salvation Army Adult

12   Rehabilitation Center.  I sent an email to that effect to both

13   Mr. Tatum and the pretrial services office so that they could

14   verify that before he would arrive there tomorrow, if he's

15   released out on bond.

16        Certainly, at the adult rehabilitation center there,

17   his environment will be controlled.  He'll be required to live

18   there under their rules and under their constraints.  If this

19   Court informs them that he is not to access any computers, I'm

20   sure they will make sure that he has no computer access.

21        He will have plenty of activities in his

22   rehabilitation process.  He will have a place to live.  He'll

23   have a place to eat, and I'm sure they will give him some

24   manner of work there at the rehabilitation center while he is

25   there in their charge.

1          So, he has a place to go, a place that can be

2    supervised, a place where he can easily be found any moment of

3    the day.

4          With regard to the victims and their -- or the

5    alleged victims and their concerns, certainly he's going to get

6    out of jail someday and so he's going to be under supervision

7    then, too.  He'll be free to move about the cabin, as it were,

8    utilizing the air metaphor.  So, he'll be allowed to go about.

9    The fear that they have, although reasonable, can be addressed

10   by the fact that he will be living with the Salvation Army as

11   opposed to wandering the streets on his own.

12         The Salvation Army, I believe, has an excellent

13   public reputation for not only doing what they do to assist

14   people in times of crisis, but also for taking care of people

15   long term and helping them get back on the road to what we

16   would call productive adult life.

17         So, we offer that to the Court as a way that he can

18   be supervised.  He won't be taking up any more time and money

19   in the Denton County jail until this case is over with.  If

20   he's convicted, then of course he'll have to go back to jail.

21   If he's not convicted, then he can resume his life, such that

22   it may be, considering he's under supervision, in other places.

23         **THE COURT:**  Thank you, Mr. Arrambide.  Anything

24   further, Mr. Tatum?

25         **MR. TATUM:**  No, Your Honor.

1          **THE COURT:**  All right.  Mr. Alldred, if you'll please

2    stand, sir.

3          Mr. Alldred, I find that you shall remain detained.

4    The Court will enter an order to that effect.  Is there

5    anything further from the Government?

6          **MR. TATUM:**  No, Your Honor.

7          **THE COURT:**  Anything further, Mr. Arrambide?

8          **MR. ARRAMBIDE:**  Not at this time, Your Honor.

9          **THE COURT:**  Thank you.  Mr. Alldred, you'll be

10   remanded to the custody of the United States Marshals.

11          **DEFENDANT ALLDRED:**  Thank you.

12          **THE COURT:**  Court is adjourned.

13      **(Proceeding was adjourned at 10:41 a.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          June 15, 2018_


TONI HUDSON, TRANSCRIBER