1

```
                    UNITED STATES DISTRICT COURT
1
                     EASTERN DISTRICT OF TEXAS
2                         SHERMAN DIVISION

3
     UNITED STATES OF AMERICA      :    DOCKET NO. 4:17CR105
4                                  :
     VS.                           :    SHERMAN, TEXAS
5                                  :    AUGUST 22, 2018
     DEREK MYLAN ALLDRED          :    9:40 A.M.
6

7

8                        SENTENCING HEARING
            BEFORE THE HONORABLE AMOS L. MAZZANT, III,
9                 UNITED STATES DISTRICT JUDGE

10
     APPEARANCES:
11

12   FOR THE GOVERNMENT:          MR. WILLIAM TATUM
                                  U.S. ATTORNEY'S OFFICE
13                                600 E. TAYLOR, SUITE 2000
                                  SHERMAN, TEXAS  75090
14

15   FOR THE DEFENDANT:           MR. ROBERT ARRAMBIDE
                                  FEDERAL DEFENDER'S OFFICE
16                                1800 TEAGUE, SUITE 204
                                  SHERMAN, TEXAS  75090
17

18   COURT REPORTER:             MS. JAN MASON
                                  OFFICIAL REPORTER
19                                U.S. DISTRICT COURTHOUSE
                                  101 E. PECAN
20                                SHERMAN, TEXAS  75090

21

22

23

24   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
25
```

2

1          THE COURT:  Good morning.  Please be seated.

2      We're here in Case 4:17CR105, United States of America

3  versus Derek Alldred.  And for the Government?

4          MR. TATUM:  William Tatum for the Government, Your

5  Honor.

6          THE COURT:  And for the Defendant?

7          MR. ARRAMBIDE:  Robert Arrambide for Mr. Alldred,

8  Your Honor.

9          THE COURT:  Mr. Alldred, we're here for your

10  sentencing pursuant to your final Presentence Report that was

11  filed on June 21st, 2018.  Have you had a chance to review the

12  final Presentence Report, sir?

13          MR. DEREK ALLDRED:  I have, Your Honor.

14          THE COURT:  Okay.  Just pull the microphone closer.

15      And have you had a chance to discuss it with your

16  counsel?

17          MR. DEREK ALLDRED:  I have.

18          THE COURT:  And do you understand the Presentence

19  Report?

20          MR. DEREK ALLDRED:  I do.

21          THE COURT:  And do you believe the Presentence Report

22  adequately covers your background, other than the objections?

23  I'll exclude the objections you filed, because you filed a

24  number of objections.

25          MR. DEREK ALLDRED:  Yes, Your Honor, it does.

3

1    THE COURT:  Then are you satisfied with the accuracy

2  of the report, other than the objections which we'll take up in

3  a minute?

4    MR. DEREK ALLDRED:  I am.

5    THE COURT:  And then, Mr. Arrambide, have you had the

6  chance to review the final report with your client and do you

7  believe that he understands it?

8    MR. ARRAMBIDE:  Yes, Your Honor.

9    THE COURT:  And do you have any comments, additions

10 or corrections to the report other than the objections you

11 filed?

12   MR. ARRAMBIDE:  No, Your Honor.

13   THE COURT:  On behalf of the Government, Mr. Tatum,

14 any comments, additions or corrections to the report?

15   MR. TATUM:  Your Honor, only the matter we took up

16 earlier about the loss amount.  Other than that, the Government

17 filed a motion for an upward departure in this case.

18   THE COURT:  I understand and we'll deal with that

19 later.  Then do you want to go ahead and put your agreement on

20 the record as to the loss amount?

21   MR. TATUM:  Yes, Your Honor.  After talking with the

22 defense, we've agreed to a loss amount of $254,892.41.  This

23 would make it, instead of a plus 14, a plus 12, and I'm pulling

24 up the paragraph right now.  Paragraph 48 for specific offense

25 characteristic, it would make it a plus 12 instead of a plus

4

1   14.

2            THE COURT:  Mr. Arrambide, are you in agreement as to

3   that amount?

4            MR. ARRAMBIDE:  That's correct, Your Honor, we agree

5   with what was said.

6            THE COURT:  Okay.  So I will accept that and I'll

7   certainly -- I can't change the PSR, but I will reflect in the

8   statement of reasons that paragraph 48 should show a loss

9   amount of $254,892.41, and that would change that from a plus

10  14 to a plus 12.

11       Is that all you had?

12           MR. TATUM:  Yes, Your Honor.

13           THE COURT:  Then, Mr. Arrambide, of course, you had a

14  number of objections and so let's turn to those now.

15           MR. ARRAMBIDE:  Your Honor, without abandoning the

16  objections, I believe the agreement regarding the loss amount

17  pretty much takes care of objections one, two, three and four,

18  leaving us with objections five and the remaining objections,

19  objection five being our objection that he did not receive

20  acceptance of responsibility, I believe.

21           THE COURT:  Okay.  But as to objections one through

22  four, that information is still in the Presentence Report,

23  although in terms of -- it's still conduct the Court can

24  consider, so I don't know if you want to -- I'm not sure what

25  the nature of how you're asking the Court to proceed.

5

1          MR. ARRAMBIDE:  Well, Your Honor --

2          THE COURT:  Though it's not being factored into the

3    loss amount.

4          MR. ARRAMBIDE:  We were mainly concerned that it not

5    be factored into the loss amounts, Your Honor, and I will have

6    in my allocution reasons why that information is mitigated.

7          THE COURT:  So we're on the same page.  It's still

8    relevant conduct for the Court to consider.  It's just not

9    being included in the loss amount.

10          MR. ARRAMBIDE:  Correct, Your Honor.

11          THE COURT:  Okay.  So then you don't need me to

12    address the first four.  If you want to go ahead and address

13    objection number five then.

14          MR. ARRAMBIDE:  Certainly, Your Honor.  Your Honor,

15    the probation officer has denied Mr. Alldred acceptance of

16    responsibility because allegedly he made certain statements

17    that seemed to be conflicting, the most glaring of which is

18    that he's not blind.

19      I have provided the Court and the Government with a

20    copy of a 2015 evaluation by an ophthalmologist on behalf of

21    his claim for his blindness disability, which in fact he was

22    receiving.

23      In the second paragraph or the second page, rather, of

24    that evaluation in the medical source statement:  Did they

25    do a full field vision test on him?  Yes, they did, and the

6

1    supporting documentation is included with that, and the

2    doctor's conclusions were that he has no functional vision

3    remaining.  He suffers congenitally from a couple of

4    different defects:  Marfan syndrome, which is a syndrome

5    that destroys or disfigures connective tissue, and one of

6    the ways it affects the eyes is it dislocates the lenses,

7    and so his eyes and lenses don't work properly.  He's also

8    cross-eyed.  Those things are congenital from birth.

9        He -- he has no functional vision.  He's never had a

10   driver's license.  He has driven, and it's a scary thing to

11   think that he was driving when he has vision of 2200 plus,

12   when the doctor looked at his eyes and saw what his field of

13   vision was and said there's no -- there's no more vision

14   left to speak of.  The cataracts mean that he had one lens

15   removed because of the Marfan syndrome.

16       He's not lying when he says he's blind, and so the

17   probation officer, I'm assuming, had access to these reports

18   but chose to ignore them when she decided that that

19   statement was incorrect or anomalous.

20       When I objected and said that he did in fact have

21   authorization to use certain people's credit cards, he did.

22   Not he, the Defendant Derek Alldred, but his alter ego that

23   he created, and his alter ego wasn't anything -- any

24   creation of a mind that was medically infirm.  It was his

25   creation.  That's what alter ego means, much like a

7

1    corporation.  So the alter ego had permission to use those

2    credit cards.  He didn't, he, the Defendant.

3         The alter ego had permission in at least one statement

4    by an alleged victim, had permission to engage in consensual

5    sex.  He, Derek Alldred, the Defendant, didn't, and so she

6    feels raped.

7         So therein lies the difference and distinction.  It's a

8    distinction that doesn't matter for criminal purposes but it

9    does matter for his acceptance of responsibility.

10        He made the statement but it's completely consistent

11   with his acceptance of responsibility.  There was permission

12   to use those credit cards.  It just was gotten nefariously.

13   It was fraud in the inducement to get permission to use

14   those credit cards, and he accepted responsibility for that.

15        He didn't take the Government to trial.  It would have

16   been a very interesting trial, I think, frankly.  But he

17   chose not to.  He chose acceptance of responsibility for

18   what he had done to the women here in Dallas/Fort Worth and

19   here we stand ready for sentencing.

20        Not having taken the Government to trial is a huge part

21   of acceptance of responsibility, and so because we saved

22   probably a week or two of trial, we think he deserves

23   acceptance of responsibility, Your Honor.

24              THE COURT:  Thank you.  Mr. Tatum?

25              MR. TATUM:  Your Honor, in relationship to the alter

1   ego, the Defendant is the one in this case and he is the one

2   who's trying to get acceptance of responsibility.  To try and

3   split himself into two and say, well, actually, I did not

4   commit those crimes, my alter ego, Rich Taylor, or whoever it

5   was committed those crimes is somewhat ridiculous.

6        He knew he was the person committing the crime.  He

7   knew he was not Rich Taylor.  He knew he was Derek Alldred.

8   He told them he was a different person in order to hide his

9   identity, in order to get them to provide him with the

10  money, with the credit cards, and in order to get in their

11  lives in every single victim in this case.

12       To stand up here and say Derek Alldred accepts

13  responsibility but your alter ego does not accept

14  responsibility, well, Derek Alldred is the one who's the

15  Defendant in this case.  He knows none of these other

16  personas are real.  He knew it was him the entire time doing

17  this.

18       So in that situation, I don't think you can stand here

19  and say, yes, I have accepted responsibility, but the person

20  who received consent for all these items, you know, they

21  actually had consent, even though that was me just acting as

22  a different person.  It doesn't make any sense.

23       In regard to the issue involving the blindness, the

24  report that was provided is from 2015, I believe, and the

25  facts have shown that in 2016, 2017 the Defendant was

9

1    borrowing these victims' cars.  He was driving their cars.

2    He's giving them this persona that he's a pilot, that he's a

3    professor, all of these things, and never at any point is

4    there ever any question that, oh, and by the way, I'm blind.

5         The life he's living is not conducive with someone who

6    is blind.  And when you look at his history through the

7    statements that were provided in the Presentence Report and

8    then through some of the victim impact statements, there's

9    never a point where the Defendant in any way is acting as if

10   he's got some sort of eyesight problem.

11        And in fact, when he was arrested and brought here, it

12   wasn't until after the Presentence Report interview that he

13   notified anyone in the jails about his eyesight problem.

14        I know there's -- as Mr. Arrambide said earlier, he may

15   have some indication that he tried to in one of the jails,

16   but as far as his custody here, this only came up after the

17   Presentence Report.

18        The Defendant is receiving, pursuant to the documents

19   they provided, Social Security payments in Minnesota for

20   that what he calls disability, and there's also an

21   investigation into that specific blindness claim in

22   Minnesota.

23        So the Defendant saying that he's blind, there's plenty

24   of evidence to the contrary that consists of the actual

25   facts in this case and the actions that he took.

10

1      For that reason, Your Honor, and for the remainder of

2  the reasons that the PSR writer pointed out in the responses

3  to the defense's objections, this Defendant did notify that

4  he was willing to plead to the conduct in the case involving

5  Dorie Watkins, and since that time he has just provided

6  contradictory statements, during the evaluation he has

7  provided to other agents about exactly what he did, and then

8  even today still saying that it was his alter ego, that they

9  actually consented to give him the stuff, therefore, he's

10  accepted responsibility but he didn't really take it without

11  their consent.

12      Overall, Your Honor, I think that the objection in this

13  case should be overruled and that he should not get the

14  acceptance of responsibility.

15          THE COURT:  Mr. Arrambide, any response, anything

16  additional?

17          MR. ARRAMBIDE:  Only that when it's suggested that he

18  somehow scammed his way through an eye exam, the examiner found

19  in fact that his lens was missing in his left eye.  That's

20  noted in the report.  When the doctor took a look at his field

21  of vision and documented it through the scales that were used

22  on page six -- it's documented at six and seven -- it's

23  documented that he doesn't have any vision left hardly, and so

24  legally he's blind.  That's an accurate statement.  Legally he

25  is blind.

11

1        He has no functional vision left, and the fact that he

2   may be able to, very scarily, drive a car and luckily hasn't

3   had an accident doesn't change the fact that he is legally

4   blind.

5        With regard to the alter ego, he has never attempted to

6   escape responsibility by using that.  He just explained,

7   hey, I got permission, I was fooling them, it was -- the

8   permission was not gotten lawfully.  It's as simple as that.

9   He has never denied that he -- he has never claimed that he

10  got the permission lawfully is the point.

11             THE COURT:  Okay.  Thank you.

12       Well, Mr. Alldred, of course, acceptance of

13  responsibility is something the Court has discretion in, and

14  typically when a defendant pleads guilty and avoids a trial,

15  they get acceptance.

16       In this situation the reason why probation did not give

17  you acceptance was you admitted the underlying offense, but

18  you have contested some of the evidence regarding your

19  relevant conduct.

20       And Mr. Arrambide makes the issue regarding the issue

21  of the report about your blindness.  That's one of the many

22  things that the probation officer looked at.  It is not the

23  only thing.

24       But as to that -- and I've looked at the report.

25  What's fascinated the Court is we have this medical report

12

1    from 2015 that supports your assertion that maybe you're

2    legally blind.  However, we also have evidence that you've

3    lived a life that doesn't show someone who is actually

4    living the life of someone who is legally blind.

5        Now, when you look at the actual facts of what you've

6    done and what you didn't complain, it wasn't until after it

7    came up in the PSR that you complained to the jail facility.

8        I don't know what weight to give the report that your

9    attorney has provided the Court.  So in the end, I don't

10   think it matters.  I don't know -- I don't know if you're

11   actually truly legally blind or not.  I really don't know.

12   I can just say that there's evidence showing that you don't

13   live the life of someone who is legally blind, and so --

14       But irrespective of that is this idea of the alter ego.

15   At the end of the day, you're the one that did not have

16   consent to do these things because you're the Defendant in

17   this case.  So it doesn't matter whether or not you had --

18   your alter ego somehow had permission or not.  You did not

19   and you're the Defendant in this case, and it's relevant

20   conduct as to you.

21       And that's the reason why the probation officer

22   recommended taking away your acceptance points is your

23   denial of relevant conduct.

24       So the Court is going to overrule your objection.

25   Based on a preponderance of the evidence, there is

13

1    sufficient evidence of inconsistent statements throughout

2    this to allow the Court to say that you have not shown a

3    true acceptance of responsibility for all your actions, so I

4    am not going to give you acceptance points in this case.

5        Objection number six.

6            MR. TATUM:  Your Honor, I believe objection number

7    six goes to the agreement earlier for the loss amount.

8            THE COURT:  Okay.  Well, your objection was -- since

9    you've agreed to that amount, I guess, Mr. Arrambide, you want

10   to withdraw objection number six?

11           MR. ARRAMBIDE:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. ARRAMBIDE:  Objection number seven involves

14   alleged sophisticated means, that he purposefully relocated as

15   part of a -- I mean, typically sophisticated means and

16   relocation issues involve a continuing fraud and attempt to

17   evade detection.  And in this particular case, although we have

18   a relocation, he's been in San Francisco, he's been in Hawaii,

19   he's been in Minnesota, those were all places that his family

20   had either lived at times or the family had routinely visited,

21   and so that's not unusual for Mr. Alldred to have been in those

22   areas.

23       He was from Minnesota.  He grew up in California.  His

24   mother has returned to Minnesota at this point.  They used

25   to vacation in Hawaii, so those were all places that he was

14

1    very familiar with.  The only place he's ever come to that

2    was different was basically Texas.

3        But more importantly, we have discrete people -- this

4    was not a continuing scheme where he relocated to avoid

5    detection.  He had already been detected in Minnesota.  He

6    had already gone to jail in Minnesota and he left Minnesota.

7    It's as simple as that.  When he had the opportunity to

8    leave, he left.

9        So he didn't use sophisticated means to relocate, and

10   that was the basis for the enhancement, as I recall, and so

11   we don't believe it applies.  He didn't use any particularly

12   sophisticated means.

13       He got on the computer, met women, talked them into

14   spending lots of money in some cases, took some of their

15   money wrongfully in other cases, and here we are.

16            THE COURT:  And you don't think it's sophisticated

17   means that basically while one fraud was happening, another one

18   was being set up, this whole process?  He skipped from -- I

19   mean, he skipped from person to person, committing fraud upon

20   fraud, and that's how -- looking at the victims' statements,

21   certainly some of them connected because certain things were

22   going to different houses of the new victim.  I mean --

23            MR. ARRAMBIDE:  Well, I mean --

24            THE COURT:  How does someone -- I mean, if that's not

25   sophisticated, what is?

15

1          MR. ARRAMBIDE:  Your Honor, that's to say any

2    Lothario who dates more than one woman at any given time is

3    sophisticated somehow.  You get on the computer, and almost

4    everybody knows how to operate these computers now.  And, yeah,

5    I understand what the Court is saying by --

6          THE COURT:  I'm not talking about the fact that he

7    was going from woman to woman in that sense.  I'm talking about

8    the financial matters that he took from each person to each

9    person, that scheme.

10          MR. ARRAMBIDE:  Well, Your Honor, that would suggest

11    some sort of plan, and I know that Ms. Pardini at least has

12    been alleging all sorts of wild theories about his planning,

13    and in fact, she makes allegations that there are other people

14    involved in helping him with these schemes, and yet there's no

15    proof of any of that.

16      You know, he dated multiple women at once.  He

17    defrauded them at the same times, Your Honor, as he was

18    dating them.  That's not sophisticated.  That's just who he

19    is, unfortunately.

20      So there was nothing -- it's not like he created these

21    complex algorithms with which to do this.  He basically

22    talked them out of things and talked his way into their

23    lives and utilized that access, which is completely normal

24    in fraud cases.

25          THE COURT:  Well, Mr. Arrambide, it seems like you're

16

1    simplifying what he did versus -- anyways, anything else?

2         MR. ARRAMBIDE:  Your Honor, that -- that is it in a

3    nutshell, that all he did was gain access through the normal

4    means.  He didn't do anything sophisticated particularly to get

5    that access.  He did what somebody would ordinarily do in a

6    fraud scheme.  There was nothing particularly complex or tricky

7    about it.  He didn't utilize any specialized computerized

8    skills.  He didn't utilize any particular skills at all.

9         THE COURT:  Mr. Tatum.

10        MR. TATUM:  Your Honor, the Defendant in this case,

11   as pointed out in the probation officer's response, created

12   sort of multiple personalities or personas to get into the

13   victims' lives in this case.

14       When he was eventually arrested, he had government --

15   I'm sorry -- NCIS agent badges, government ID cards.  He had

16   gone and, of course, bought the uniform that he wore to

17   present himself as a Navy officer.  He presented himself as

18   a professor.  He presented himself as an attorney at one

19   point, and he had enough sophistication to be able to pull

20   those roles off to convince people he was these actual

21   individuals.

22       He did go on-line and purchase military uniforms,

23   military awards, government badges, anything he could use to

24   try and forward this persona that he was in at the time.

25       At the same time he was doing this, he has another

17

1  person that he's also presenting himself as either an

2  attorney, a professor, a pilot, who he's engaging in this

3  same conduct with and he has set it up to the point -- I

4  mean, to a sophisticated enough point that when Victim A

5  takes him to the airport to drop him off to go to his

6  military duties, Victim B comes and picks him up from the

7  airport because he's just returning from his military

8  duties.

9          The Defendant -- in addition to that, aside from those

10  multiple personas, he went on-line to seek these women out.

11  Several of them met him through a dating website.  Him going

12  on-line, looking at these various individuals and then

13  deciding which ones to strike up a relationship with

14  in order to get into their lives shows a level of

15  sophistication.  He wasn't just bumping into people and

16  stealing their credit card.  He was immersing himself in

17  their lives so that he could clean them out of everything.

18          The fact that he moved around from jurisdiction to

19  jurisdiction does show, as well, a level of sophistication

20  because he did that whenever somebody would finally realize

21  that this person is not who he said he was.  Then he would

22  move jurisdictions and start up the fraud in a new

23  jurisdiction.  And that's how he ended up in Minnesota,

24  Hawaii, Nevada, California and eventually Texas.

25          So I think the Defendant's conduct through these years

18

1    and through all these different victims does absolutely show

2    a level of sophistication in perpetrating this fraud.

3            THE COURT:  Thank you.  Mr. Arrambide, anything else?

4            MR. ARRAMBIDE:  Your Honor, the application of

5    sophisticated means means especially complex or especially

6    intricate offense conduct pertaining to the execution or

7    concealment of the offense, and they give the example of

8    telemarketing schemes that are located in one jurisdiction and

9    marketing in other jurisdictions.

10           But I think if you think of it as -- and there's a

11   reference note to abuse of trust and skill enhancements.  If

12   you think of it in that way, he didn't use any specialized

13   skills.  He got on the computer, on the internet, which most

14   everybody can do today from the age of four years on up to

15   at least 60 years old, because we grew up with computers in

16   that timeframe.

17           There was nothing particularly complex about any of

18   this.  He got into women's lives and he abused the trust

19   that they gave him.  It's as simple as that.

20           And I'm not trying to oversimplify it.  I'm trying to

21   put it in the context of what it is.  Like I said, he didn't

22   create complex algorithms.  He didn't specifically target

23   people here, here and here.  He targeted the women where he

24   was located.  He didn't target one at one time in Hawaii and

25   one at one time in Chicago and one down in Dallas all at the

19

1    same time.  He -- he dealt with women with where he was

2    located, and he didn't try to locate it for the purposes of

3    not being caught.  So we just don't think it applies, Your

4    Honor.

5              THE COURT:  Okay.  Well, I understand the argument

6    you're making, but I am going to overrule your objection.  I do

7    believe, based on a preponderance of the evidence, that there

8    is sufficient evidence here to support this enhancement of two

9    points under the sophisticated means.

10         And part of that is because I do think you are trying

11   to oversimplify it.  And I understand that's your job as his

12   lawyer to do so, but it's more than just stringing along a

13   number of women.  It is what he did throughout this whole

14   process.

15         He carried on this fraudulent scheme over multiple

16   states, counties, municipalities as he did this activity.

17   He created multiple false identities and backgrounds in

18   order to avoid detection and keep this scheme in operation.

19         So this behavior I think qualifies for what is

20   considered or requires a level of sophistication more than

21   what you want to try to give it.  So I don't think the

22   general public would have the ability to do what he did in

23   keeping this scheme going on for such a long period of time.

24   So I'm going to overrule that objection.

25         Objection eight.

20

1        MR. ARRAMBIDE:  Objection eight, Your Honor, involves

2   possession of a firearm.  The possession of the firearm in this

3   particular case, we claim, is completely incidental.  He

4   borrowed a car from one of the victims.  The victim's firearm

5   was in the car and it was there.  He knew it was there.  He

6   knew he was a felon and he shouldn't have been there with the

7   car and the firearm, but he never consciously sought out that

8   particular firearm.  He never tried to get that firearm.  It

9   was just there.  It just happened to be in his presence, and he

10  didn't do anything to not have it in his presence.  He didn't

11  use it, employ it in that way, and so, again, it just doesn't

12  apply, Your Honor.

13        THE COURT:  Mr. Tatum.

14        MR. TATUM:  Your Honor, in this case he did come into

15  possession of the firearm.  Both -- two victims saw him in

16  possession of the firearm, and they also -- he borrowed a

17  holster from one of them to use that firearm.

18        But I think the important fact is that when he saw one

19  of those victims and they saw the firearm, he told them that

20  this firearm had been issued to him because he was in the

21  Navy.  He used it to perpetrate this fraud that he was in

22  fact a U.S. Naval officer and he was a pilot.

23        In addition to that, he had told one of the victims

24  that he has a badge, a federal badge to carry a weapon on

25  him, the firearm.

21

1    So I think it goes above and beyond just merely coming

2  into contact with it as opposed to using it in order to

3  further the fraud that makes up this case.

4              THE COURT:  Thank you.  Mr. Arrambide, anything else?

5              MR. ARRAMBIDE:  No, Your Honor.

6              THE COURT:  Okay.  I'm going to overrule the

7  objection.  This comes up in a little different context than I

8  usually see it in terms of the possession of the firearm and

9  the enhancement, and this is under paragraph 52 of the

10 Presentence Report.

11   But Mr. Tatum is correct that however he came into

12 possession of the firearm, he came into possession and it

13 qualifies for the enhancement.  He knew it was there.  He

14 asked for the holster and that's a separate fact.  And he

15 didn't make any effort to separate himself from the firearm

16 once he came in possession of it.

17   So he knew he had it and he could have gotten rid of it

18 or separated from it and he didn't do that.  So I think the

19 enhancement is properly provided and I find so by a

20 preponderance of the evidence and overrule that objection.

21   Objection nine I guess is just a general objection, Mr.

22 Arrambide, correct?

23              MR. ARRAMBIDE:  Correct, Your Honor.

24              THE COURT:  So I'll overrule that except -- well, I

25 guess that one -- that's 59.  Technically you -- well, because

22

1   of the agreement on the amount, that will get lowered two

2   levels, but I'll overrule your objection as to it should be

3   what you think as to the amount.  We'll recalculate in a

4   second.

5        Objection ten deals with the visual impairment.  Do you

6   want to add anything else to that?

7             MR. ARRAMBIDE:  Well, Your Honor, with regard to

8   objection ten, I mean, certainly the United States Government

9   believes that he is visually impaired.  I'm not certain that

10  any other component of the U.S. Government at this time can --

11  can technically overrule that.  They have made their findings,

12  and I think SSA being a part of the executive, I'm not sure

13  that the U.S. Attorney's office is in a position to overrule

14  their findings.  Certainly they can investigate them, but we

15  stand by that finding by the Social Security Administration,

16  Your Honor.

17            THE COURT:  Well, again -- oh, go ahead, Mr. Tatum.

18            MR. TATUM:  Judge, we don't have anything else to add

19  other than what we said earlier.

20            THE COURT:  What I will note is -- I will go ahead

21  and put it in the statement of reasons because I can't change

22  the Presentence Report and just indicate that your client

23  claims that he is legally blind and has been so found by Social

24  Security or by documents submitted to the Social Security

25  Administration.

23

1    I think this has no impact on the guideline range, does

2    it, Mr. Arrambide?

3    MR. ARRAMBIDE:  Only to the extent that it impacts

4    his acceptance of responsibility, Your Honor, which you've

5    already ruled on.

6    THE COURT:  I understand that and I've already ruled

7    on that issue.  Again, his conduct is different, but I'm making

8    a note that you're asserting that for purposes -- because I'm

9    not going to change the report.

10   Again, I don't know what weight to give the report you

11   submitted to me, as I said before.  His conduct since that

12   shows something different, and so I don't know the answer.

13   So I assume the Bureau of Prisons will evaluate that

14   themselves to determine what his eyesight capability is.

15   Okay.  So to the extent -- I'll overrule the objection

16   to the extent I need to, but I will make note in the

17   statement of reasons that he's asserting that.

18   Objection 11.

19   MR. ARRAMBIDE:  Objection 11, Your Honor --

20   THE COURT:  That's already been taken care of, I

21   think.

22   MR. ARRAMBIDE:  Well, Your Honor, I think it speaks

23   for itself.  Clearly the doctor didn't say what was claimed in

24   the Presentence Report, and I've highlighted what the doctor in

25   fact did say, quoted him from the report directly, that he

24

1    would be a candidate for group therapy so that he can certainly

2    learn the things he needs to learn before going on to

3    individualized therapy.

4              THE COURT:  Well, in terms of the response, probation

5    just went ahead and quoted the -- took direct statements from

6    the evaluator.  So what's your objection now?

7              MR. ARRAMBIDE:  My objection is that -- that he is a

8    good candidate for psychological counseling in the Bureau of

9    Prisons.

10             THE COURT:  Mr. Tatum.

11             MR. TATUM:  Your Honor, we would just refer to the

12   quote that's actually been provided in the report that says his

13   prognosis at this time is guarded.

14             THE COURT:  I guess, Mr. Arrambide, I'm not sure I

15   understand what you're asking the Court to even do here.  I

16   mean, the probation officer switched it and quoted the language

17   from the evaluator on prognosis.

18             MR. ARRAMBIDE:  We're just looking for that

19   ultimately to have that recommendation from the Court that he

20   be given psychological counseling in prison, as opposed to

21   ignoring it.

22             THE COURT:  Well, I am going to recommend mental

23   health treatment, so is that sufficient?

24             MR. ARRAMBIDE:  Yes, Your Honor.

25             THE COURT:  Okay.  And that concludes your

25

1    objections?

2              MR. ARRAMBIDE:  Yes, Your Honor.

3              THE COURT:  Okay.  Of course, based on the stipulated

4    amount regarding restitution -- well, the loss amount, that

5    will change paragraph 48 to just plus 12, which will lower the

6    total offense level to 27.

7         So, Mr. Alldred, you pleaded guilty to three different

8    counts:  Count three, aggravated identity theft; count four,

9    a second count of aggravated identity theft; and then count

10   six, mail fraud.  To the extent that I have not previously

11   accepted those full plea agreements, I will certainly do

12   that at this time.

13        Can I have probation approach?  I want to go over the

14   calculation.

15                        (Off the record conference with the

16                        (probation officer.

17             THE COURT:  So, Mr. Alldred, the Court finds the

18   information contained in the Presentence Report has sufficient

19   indicia of reliability to support its probable accuracy.  The

20   Court adopts the factual findings, undisputed facts and the

21   guideline applications in the Presentence Report, except for

22   the changes in terms of the agreed loss amount.  I'll certainly

23   change that amount.

24        Based upon a preponderance of the evidence presented

25   and the facts in the report, while viewing the Sentencing

26

1   Guidelines as advisory, the Court concludes as follows:

2   Your total offense level is now a 27.  Your criminal history

3   category is a VI, which provides for an advisory guideline

4   range for count three it's two years consecutive to all

5   other counts; count four is two years consecutive to all

6   other counts; count six is 130 months to 162 months of

7   imprisonment.

8        Then, of course, the Government has filed a motion for

9   upward departure or upward variance.  Do you want to speak

10  on that first before I call on Mr. Arrambide?

11             MR. TATUM:  Yes, Your Honor, if I may.

12       Your Honor, in this case I think there's several

13  grounds for upward departure consideration.  Two of them

14  were noted in the Presentence Report under

15  USSG4(a)(1.3)(A)(1), information indicating the Defendant's

16  criminal history is substantially under-represented, the

17  seriousness of the Defendant's criminal history and

18  likelihood the Defendant will commit other crimes.

19       In addition to that, we've looked at United States

20  Sentencing Guideline Section 5K2.2, when the Court may

21  depart upward to reflect the actual seriousness of the

22  offense based upon conduct underlying, a charge dismissed as

23  part of the plea bargain or potential charges not pursued in

24  the case as part of a plea deal, or for any other reason

25  that did not enter into the determination of the applicable

27

1    guideline range.

2         Then finally, Your Honor, under United States

3    Sentencing Guidelines 2B1.1(20)(A)(2), if the offense caused

4    or risked substantial non-monetary harm, for example, the

5    offense caused physical harm, psychological harm or severe

6    emotional trauma or resulted in a substantial invasion of

7    privacy.

8         Focusing first on the upper departure being part of any

9    reason that did not enter into the determination of the

10   applicable guideline range or the offense causing

11   substantial non-monetary harm, when you look at the conduct

12   that's in this case, this case involves fraud, and we talked

13   today about a monetary loss and about the various amounts,

14   as you can see in the witness statements, of financial loss

15   to different victims, whether it was actual loss or intended

16   loss.

17        But what you'll also see running throughout the history

18   of this Defendant's conduct is the non-monetary harm that

19   has happened to each of these victims.  There is a common

20   theme in every single victim's encounter with Mr. Alldred

21   where they were leading a normal, happy life, and once he

22   came into their life and once he was done with his offense

23   and left them, their lives have been destroyed forever.

24        Several of the victims still are unable to enter into a

25   relationship with other people.  This one experience with

28

1  this Defendant completely destroyed any trust they've had in

2  other people and completely destroyed their ability to move

3  on and enter into a relationship with other people.

4      Some of these victims had their family affected.   In

5  each of these statements -- in the majority of the

6  statements you'll see the Defendant didn't just become part

7  of the victim's life.  He became part of the victims'

8  families' lives.

9      You see the statement where he essentially destroyed

10  the relationship between a father and his sons.  The

11  Defendant destroyed a strained relationship between a victim

12  and their father, all by entering into their lives and just

13  leaving this massive amount of non-monetary damage.

14      In addition, Your Honor, he literally stalked these

15  people on-line and chose them.  He met a lot of them through

16  dating websites.  These were individuals that he went on

17  there, looked them up, saw who they were and chose them.

18  Not that he just happened to run into them and then steal a

19  bunch of money from them.

20      A lot of these victims have lost their livelihoods, and

21  I'm not talking about just an amount of money that was

22  stolen from a credit card.  They've lost their retirement.

23  They've lost their reputations.  Their ability to practice

24  their careers are gone.

25      As you can see from Presentence Report, one of these

29

1    victims became homeless.  She had an eight year old child,

2    and by the time that Mr. Alldred left, she was gone out of

3    her house living out of a car.

4         And when you look at the Sentencing Guidelines, they do

5    talk about loss amount.  They focus on monetary amounts, and

6    then there is a provision that looked at the non-monetary.

7    This case is unique in that the amount of damage that has

8    been caused all across the United States from this Defendant

9    coming into these people's lives is non-monetary.  He has

10   completely ruined their lives, their futures, and in a lot

11   of cases, their relationships with their families.  And

12   several of them are still trying to pick up those pieces and

13   may never be able to.

14        Looking at the statements that were provided in the

15   Presentence Report, the victim impact statements provided to

16   this Court, we feel that there is grounds for a departure

17   because the Sentencing Guideline doesn't necessarily take

18   that into effect when it looks at a table that says this

19   amount of monetary loss or this amount of monetary loss.  We

20   think in this case there is an overwhelming amount of

21   substantial emotional distress, invasion of privacy,

22   non-monetary aspects that should increase the guideline

23   provision in this case in count six to the maximum of 20

24   years.

25        In addition to that, Your Honor, looking at the

30

1   Defendant's criminal history, a vast portion of his criminal

2   history involves charges that were either dismissed as part

3   of plea deals where you see 23 counts of burglary gone and

4   the Defendant receives a conviction and gets probation.

5       And we know that during these time periods where he's

6   getting these -- not miniscule but lesser charges, he was

7   out committing these frauds and following these victims all

8   across the United States.

9       Now that he's finally been caught and finally been

10  brought to court, we can look at these statements from the

11  various victims, look at the victim impact statements, and

12  realize that the things he's convicted of don't represent

13  who this person is.  He's much more dangerous than what his

14  criminal history represents.

15      So for those reasons, Your Honor, for those three

16  provisions for an upward departure, and then also in the

17  case of a variance, the reasons I've just gone over, these

18  all include mitigating circumstances that, when you look at

19  Section 18 USC 3553(a), these mitigating circumstances go

20  beyond what is provided for in that section.  As I've

21  stated, this Defendant literally destroyed their lives, and

22  he did it all across the United States.

23      The only positive thing that ever came out of this was

24  all of these victims' ability to not give up and to keep on

25  fighting across various jurisdictions for someone to finally

31

1   bring this Defendant to justice, and we have that

2   opportunity today.

3          Those circumstances, I think, qualify for a variance in

4   this case.  Either way, I believe there's substantial

5   grounds for an upward departure or a variance, and we would

6   ask the Court to do so to the statutory maximum in the

7   amount for 20 years.

8          On top of that, Your Honor, for the aggravated identity

9   theft counts, we would ask that the Court give the mandatory

10  sentence, the 24 months in each count, and run those

11  consecutive to the count six mail fraud punishment.

12          THE COURT:  Thank you.  Mr. Arrambide, normally I

13  would call upon you first but I took the Government first

14  because of their request and their motion, but I'll ask you to

15  respond and also indicate what you believe the appropriate

16  sentence would be.

17          MR. ARRAMBIDE:  Your Honor, this being a highly

18  unusual case, I'll make the highly unusual request to allocute

19  after the known victims and the other alleged victims in this

20  case have allocuted, with the Court's permission.  A lot of

21  what I have to say in mitigation is in response to the various

22  statements of theirs that I have read, and since we're not

23  going to have an opportunity to cross-examine them, I would

24  prefer that they make their statements to you first so that I

25  may reply to those statements in his mitigation.

32

1          THE COURT:  Mr. Arrambide, that's fine.  I was going

2     to do the victims after you before I call upon your client to

3     speak, but I have reviewed all the victim statements and I know

4     there's a number of victims that would like to present to the

5     Court.

6          Mr. Tatum, do you know which ones are here and which

7     ones would like to speak?

8               MR. TATUM:  Yes, Your Honor.

9               THE COURT:  Mr. Alldred, if you'll come have a seat.

10              MR. TATUM:  We'll start with Cindi Pardini, Your

11    Honor.

12              THE COURT:  If you'll speak into the microphone and

13    state your name, ma'am.

14              MS. PARDINI:  My name is Cindi Pardini.

15              THE COURT:  Go ahead, ma'am.

16              MS. PARDINI:  Finding yourself involved with a

17    psychopath is an adventure, that's for sure.  It will open your

18    eyes to the human nature, our broken society, and perhaps most

19    of all, our own spirit.  It's a dark journey that will throw

20    you into spells of depression, rage and loneliness.  It will

21    unravel your deepest insecurities, leaving you with a lingering

22    emptiness that haunts your every breath.

23          Those words jumped out at me in a book a friend

24    recently gifted to me about toxic people, and that would

25    explain Derek Alldred and how he's clearly operated on his

33

path to destruction.

First Derek would idealize his life and lie about who he was and what he could offer to bring balance and harmony and excitement into our lives.

He would brag about his purported over-the-top conquests in business as a dedicated military veteran, a firefighter, a doctor curing rare diseases, a lawyer or an investment banker.

In my case he claimed to be high-end luxury hotel developer for the Ritz-Carlton Hotel collection, splitting part of his time in Hawaii, Tahoe, and eventually wanted to move to San Francisco.

On top of that, he claimed he was an uber-wealthy financier who traveled by helicopter gobbling up expensive skyscrapers in New York and San Francisco, seriously.

I'm still left with $52,000 in debt active and another $50,000 in collections for the platinum American Express card that he took out on my line of credit.  Am Ex canceled my card and I've lost over 24 years of positive credit on my report.

I'm now in my fifth year actively fighting for justice, unsuccessfully, to say the least.  Frankly, I'm tired of not being heard.  It didn't start well when I initially reported the crime to the police in November of 2013 in San Francisco.  The female fraud officer told me she probably

34

1    wouldn't even get to it until sometime in 2015.

2        What a lot of people don't know is from the time he was

3    caught in Minnesota with Kimberly, the doctor, in 2014,

4    Kevin Melder and I were actively speaking with guards in

5    Ramsey County, the prosecuting attorney and anyone who would

6    listen to us, begging him -- begging them not to let him

7    out, including a possible extradition to San Francisco,

8    which went ignored.

9        Kevin and I started sharing individual posts to social

10   media for years before any articles were written, trying to

11   get information shared to the public.

12       Once the Pioneer Press had written articles and Kare11

13   got ahold of it in Minnesota, we continued to share to bring

14   awareness.  That's how we were able to gather the victims

15   together:  Vanessa Cabello, Kathy Doan Crowell, Tracy

16   Santucci, Kevin Melder, Sarah Mundy, Mandy Azuar, Wendy

17   Harvey, myself, Kimberly Haycraft, JoAnne, Lisa, Cathy,

18   Kimberly, Missi Brandt, Linda Dyas, the Arizona woman,

19   Victoria Stoehr in California, Kelly Snyder Peterson in Las

20   Vegas and now Dorie and Tracie.

21       It is insane.  It is absolutely all-consuming in every

22   way.  It has proven to destroy all aspects of my life, my

23   emotional and my physical wellbeing, my dignity, my sense of

24   trust, growth in my once bustling tech career, and it has

25   ultimately left me financially devastated.  What started out

35

1    as hundreds of thousands of dollars has now turned into a

2    loss of $1.7 million.

3         In the prime of my earning potential and my career that

4    I worked so hard to build in San Francisco for over 20

5    years.  I've been hospitalized a whopping nine times, six of

6    which I was transported via ambulance.  I have suffered

7    massive anxiety attacks from trying to unsuccessfully repair

8    my financial losses, resulting in violently throwing up bile

9    every single morning in my kitchen sink, and also

10   hospitalized twice for grand mal seizures.

11        Again, it has been five years.  Two years ago I was

12   transported to the hospital once again via ambulance with a

13   feeling I was going to have more seizures.  I later checked

14   into an intensive outpatient -- inpatient treatment center

15   for an entire month, exiting with a diagnosis of complex

16   post-traumatic stress disorder.

17        I spent the entire year after that in intensive therapy

18   two days a week in hopes I could put this behind me.  I'm

19   lucky to be alive, but I can't say I've always wanted to

20   live.

21        I was once a very social person and vibrant.  I've now

22   become someone who never goes out to dinner with friends.  I

23   never socialize.  I never go to parties.  I never make plans

24   to go out of town, and I barely go out of my house.

25   Arguably, I'm a recluse with no life, and I feel defeated.

36

1     I want to feel like -- I want to feel like all of this

2  time and energy we have invested in trying to bring

3  awareness to Derek Alldred's antics, which are clearly

4  documented now, over the course of 25 years swindling, has

5  meaning.

6     It isn't just a romance scam everyone wants to eagerly

7  point this out to be, although those are the stories that

8  haven't been heard, and we seem to want the justice that we

9  deserve as well.

10     I want to believe that the justice system sees the

11  people, that people like this should not be allowed to just

12  come into people's lives and willingly destroy them and

13  their families, their livelihood and their future.

14     Every single second of every single day I carry the

15  stress, the burden, the anxiety and the unease this has

16  created for me.  I'm still seeking professional help and

17  work through all the trauma, which is still so centrally

18  prominent in my life.  The night terrors are absolutely

19  paralyzing, and every day consistently throughout the day I

20  have to reset, recalibrate and get ahold of myself.

21     It shows up in every single moment of every day, and I

22  am battling to stay emotionally, physically and mentally

23  healthy.

24     I live in fear when this man is released he will

25  continue to harm vulnerable women, who are likely in their

37

1  seventies and in the sunset of their lives and looking to

2  find a companion and enjoy what they have created in their

3  lives.

4      My only hope is with this sentencing, he can no longer

5  hurt innocent people and that I find a way to heal from this

6  horrific situation.

7      Thank you.

8          THE COURT:  Thank you, ma'am.  Mr. Tatum, who's next?

9          MR. TATUM:  Your Honor, Vanessa Cabello.  Then, Your

10  Honor, we'll do Tracie Cunningham until Ms. Cabello gets back.

11  Tracie Cunningham?  Okay.  Your Honor, Dorie Watkins.  Ms.

12  Cunningham would rather the Court rely on her written

13  statement, Your Honor.

14          THE COURT:  Okay.

15          MR. TATUM:  So we'll call Dorie Watkins.

16          THE COURT:  Ms. Watkins.

17          MS. WATKINS:  May 17th, 2017, was the last day I

18  would be the trustful, loving, giving person that I had been

19  for 50 plus years.  It was the day that I uncovered that my

20  boyfriend, Richey Taylor, who I now know is Derek Alldred, had

21  conned and manipulated me.

22      Outside of the mental games he played and the lies he

23  told me, in the span of just six weeks he stole over

24  $17,000.

25      Derek is a career criminal.  He knew I was vulnerable

38

at that time in my life as I had just gone through a divorce.  He latched onto it.  He has history of preying on women in similar situations.

I'm now under the care and have been for the past year of a psychologist who is helping me deal with the situation. I, too, have been diagnosed with post traumatic stress disorder and there are several triggers that can send me into a very deep panic attack.

This monster has ruined my trust in everyone.  I'm afraid of leaving my home because he knows where I live. I'm told that I shouldn't be scared because he's been behind bars, but I've seen in the history that over and over and over again the justice system has let us down.  Once again, because he's such a manipulator, I'm afraid the legal system will release him.

Rather than get a job like everybody else in society, he's made a career out of stealing and swindling women since the 1990s.  There's a trail of victims behind me throughout the United States.  Each were failed by the legal system. Each were failed by the legal system to press charges for the crimes he did.  Because of those failures, he was free and found me.

The day that I trusted Derek was the worst mistake of my life, but the day I uncovered who he really was, I vowed I would be his last victim, and at least for now I am.

39

1     There was at least 25 victims behind me that couldn't

2  stop his crimes, yet I did.  The State of Texas did.

3     I plead that the maximum number of years in prison is

4  given to him, years without the chance of parole.  He has

5  sentenced me to a lifetime of untrust and fear.  No matter

6  what sentence he's given, it's not going to compare to the

7  one he's given me.

8          THE COURT:  Thank you, ma'am.  Mr. Tatum.

9          MR. TATUM:  Melissa Brandt.

10         THE COURT:  Would you state your name, ma'am?

11         MS. BRANDT:  I'm Melissa Brandt.

12         THE COURT:  Thank you.

13         MS. BRANDT:  From the moment we made our first date,

14 my life has been upside-down.  I spent all of the summer of

15 2016 waiting, continually being anxious, arguing, disappointed

16 and sad.

17    He came into my life when my life was happy, calm and

18 moving upward in every way.  I trusted him.  My kids trusted

19 him.  My friends and family trusted him, or me on the

20 decision I made on dating him.

21    Since I found who he really was, my income has went

22 from $47,000 to a whopping $29,000.

23    I allowed myself to be completely distracted with all

24 of his lies and fake drama.

25    I get up every day, work myself dizzy and make very

40

little money.  I do it because I have to.  Not a single day actually goes by that I'm not reminded of the awful mistake that I made, trusting him.

Not only the financial aspect is a daily struggle.  How I look at people, how I feel about people, and it's just very hard to explain.  Actually, I haven't found the words in two years.  I guess I would say I feel dirty inside now. I don't like to use the word shame.  I was really feeling shameful of myself.  And I don't like victim, and next to some of the other women that I have met in person, I don't feel like I'm so much of a victim.

Two years later I'm a nervous wreck.  I cry more than I ever have.  I just keep to myself, and I'm letting this define me to some extent, and I can't have it.  I'm also seeking therapy.

And how this has impacted my life has been every way that you can think of, and it's just too hard to put into words.

I am grateful that someone has taken this man and what he does seriously.  He destroys lives.  He just completely destroys everything.

I'm begging for the maximum punishment.  I beg for harsh parole.  From his extensive criminal history, from where we are today, we all know he will just be out doing the exact same thing.

41

1        And my 12 year old daughter also wrote an impact

2    statement and her name is Reese Brandt.

3        So I met Derek over two years ago.  When I met Derek,

4    he seemed so nice and he was funny, but then he would

5    disappear for a day, two days or even longer.  And my mom

6    would start getting a little nervous, suspicious, and after

7    this happened several times -- she actually said a few

8    hundred -- she would break up with him and there would be

9    some mean words exchanged, and somehow he would figure how

10   to make his way back into my family's life.

11       Each time we would welcome him back because he just

12   seemed so warm-hearted.  He would promise us so much but

13   never fulfilled any of his promises.  He hurt my family and

14   he took so much time out of our lives, and to then find out

15   that he lied about everything, it really stunk.

16       Everything was going so well, but then he came along

17   and many things went down from there.  If he hadn't come

18   into our life, we would have been a lot -- we would have

19   been a lot better, not to mention a whole lot of less tears

20   spilled and stress would have never happened.

21       I would like to go to Texas to make a difference in

22   this bad situation.  I would also like to make sure that

23   Derek stays in jail so this will never happen to my family,

24   never happen to any other women and their family.

25       We are now close friends with another victim of Derek.

42

1  Linda is a really good person, and we have had to watch her

2  struggle from how Derek took from her.  She is nice, smart,

3  kind, and she had to start from ground zero because of what

4  he took.  She was also doing very good before he came into

5  her life and took so much.

6        THE COURT:  Thank you, ma'am.

7        MS. BRANDT:  Uh-huh.

8        THE COURT:  I'll note for the record too, Ms. Smith

9  has now appeared.

10        MS. SMITH:  Just briefly, Your Honor.  Mr. Tatum

11  needed a small break.

12        THE COURT:  That's fine.  And who's next?

13        MS. SMITH:  Next, Your Honor, we would like to call

14  Linda Dyas.

15        THE COURT:  Ma'am, if you'll state your name for the

16  record.

17        MS. DYAS:  My name is Linda Dyas.

18        THE COURT:  Thank you, ma'am.

19        MS. DYAS:  I am angry.  I am sick to my stomach

20  listening to the lies that Derek, Richard Derek Peterson as I

21  knew him, continues to perpetrate on this Court.

22      It is astonishing that this man has the audacity to

23  dispute any of the claims made by the ten victims in this

24  room and 15 additional victims that I know of, and hundreds

25  of additional businesses, hospitals, banks, credit card

43

companies, victims and victims' families that he has also perpetrated.

I want you to know who I am.  I'm a U.S. Navy veteran. I have a BS in chemistry.  I have all but my dissertation and my chemistry PhD from Texas A&M.  I have a Master's in Business Administration, I have two senior reactor operator licenses at nuclear power plants from the NRC in this country.  I've held top secret clearance, and I have been subjected to FBI investigations periodically since 1992.  I have both my Series Seven and Series 66 licenses.  They're inactive now.

I'm a mother.  I'm a good mother.  I'm a divorced woman.  I'm a victim of Derek Mylan Alldred.

My world was shaken to the ground.  The events that followed his arrest were devastating.  I'm not sure how I survived them or if I'm done surviving.

Every box moved I moved, every corner I cleaned, I found evidence of something else he was trying to steal or had hidden from me for his advantage.

I was able to scrape together rent through May when I was finally evicted from the house that Derek had rented.  I had a huge garage sale and made enough money to store some of my belongings in two pack rat containers.

My son and I stayed on the floor at a friend's house for the last two weeks of school.  I was officially

44

1    homeless.

2        I am angry that so many women have lost their future,

3    their savings, and in some cases, homes prior to me.  I'm

4    still confused as to why one man has been allowed to violate

5    women, children, families for more than 25 years, why he has

6    been allowed to destroy lives, to live an extravagant,

7    ostentatious, absurd lifestyle on the backs of average

8    people.

9        I'm astonished that our judicial system has believed

10   his lies.  I'm floored that these judges in the states have

11   not taken his previous convictions into account when dealing

12   with him in the next conviction.  And I'm happy that this

13   Court is considering our statements.

14       I'm angry that most officers that I've dealt with in

15   the past two years believe that I'm simply a jilted

16   girlfriend with a boyfriend who cheated on me, that my

17   report was merely a way to get back at my ex-boyfriend.

18       The sheriff's office was coming after me and going to

19   arrest me for writing fraudulent checks, when Derek admitted

20   to writing the fraudulent checks and admitted that he had

21   stolen my checkbook without my permission.  They never

22   arrested him.  They never charged him.  And I don't

23   understand that I was going to get arrested for the

24   fraudulent checks he wrote, but when he admitted it, nothing

25   came of it in the State of Minnesota.

45

1    I want this type of con to be taken seriously.  I want

2   this to be treated seriously in a court.  I want Derek Mylan

3   Alldred to face real consequences for the devastation that

4   he caused in people's lives and in my life.

5    Out of all my confusion and anger, I'm certain of one

6   thing.  I'm certain that Derek Mylan Alldred will continue

7   to steal, to con and to lie once released.  He's done it

8   right here in this court today.

9    We will not be his last victims.  If he is unable to

10   victimize someone while in prison, possibly on the internet

11   or through mail, then when he is given freedom at the end of

12   his sentence, he will victimize again.

13    His only list of job skills in this life are

14   impersonation, deception, graft, theft, manipulation,

15   fencing, cyber criminal behavior, cyber terrorist behavior,

16   harassment and identity theft, and he should face the

17   highest punishment, I beg of you.

18          THE COURT:  Thank you, ma'am.  Mr. Tatum.

19          MR. TATUM:  Yes, Your Honor, Kevin Melder.

20          THE COURT:  Would you state your name for the record?

21          MR. MELDER:  Kevin Melder, sir.

22          THE COURT:  Okay.  Thank you, sir.

23          MR. MELDER:  I'm going to get ready.

24    Your Honor, my name is Kevin Melder, and I'm here for

25   my two sons, Jake and Cody, who this man, Derek Alldred, was

46

1    their stepfather.  He was married to Tracy Santucci from

2    April, 2011 to April, 2013.  Tracy filed for nullity based

3    on bigamy.  He not only dates two women at a time, sir, he

4    also marries two women at a time.

5         I appreciate the Court allowing me the opportunity to

6    speak about the ongoing devastation and impact the

7    Defendant, Derek Mylan Alldred, had imposed specifically on

8    my sons, Jake who was ten at the time and Cody at nine.

9         I apologize if my statement is a bit long, but the

10   impact and the reign of terror is much longer.  The impact

11   is so much more than just false identity and some mail

12   fraud.

13        I would like to bring the Court's attention to some

14   other compelling facts that I feel will give a very clear

15   and precise picture of this -- who this diabolic human being

16   is.

17        May I ask the Court, Your Honor, when you consider

18   sentencing, two things to keep in mind, the culpability and

19   recidivism.

20        Like most of his victims, he found the boys' mother

21   on-line.  They were introduced.  There was no introduction

22   to my kids.

23        One day Jake and Cody came home from school and found a

24   strange man in their mom's bed.  They were told this is

25   Derek, he's going to be your new stepdad.

1          Many people know my story.  And it's funny how when you

2     say a small world, because I grew up in North Dakota.   I

3     graduated with five kids.  What's the chance that one of

4     them is going to read an article in the newspaper about

5     Derek Alldred?  Well, that happened.  Reading the Fargo

6     Forum on a Sunday, he read a little tiny article how this

7     man left this woman and her two kids at the St. Paul Hotel,

8     and the name was Derek Alldred.

9          So my friend, Tom Fetener called me and he says -- he's

10     the godfather of my son.  He says isn't that the kids'

11     stepdad?  I said yes, it is.  Who wrote that article and

12     where did that article come from?  Because it was Associated

13     Press.

14          One of Derek Alldred's favorite sayings is due

15     diligence, you need to do your due diligence.  So I did mine

16     that day.  I called the Pioneer Press and I spoke to Tad

17     Vezner and we talked in detail.

18          It was very overwhelming and it's very hard to believe

19     some of the stuff I was telling him.  He asked me, can I

20     send proof?  I did.

21          This opened the door for social media where Cindi

22     Pardini and myself started talking.  I was very reluctant to

23     talk to anybody, because who can I trust?  I didn't know who

24     was on whose side.

25          So this went on for a bit, as this man was destroying

1      people's lives.  Therefore, Cindi and I stayed on his trail.

2          As you've heard or you will hear everyone's horror

3      stories about Derek Alldred and what he's caused, this is my

4      story.  And I want to thank Tad Vezner and Lauren Lamencek

5      because they are the ones that helped bring us all together,

6      because we have no trust.  We don't trust anybody.  But with

7      them, we're able to work together and bring this together.

8          So my story starts with Jake, who was ten, and Cody,

9      who was nine.  They had never even seen their mother date

10     before.  All of the sudden Derek moves in and he takes

11     control of his reign of terror.

12         Jake and Cody both described Derek as a nice man when

13     other people were around, but, Dad, he's mean when he's left

14     alone.  They told me of the headlocks, the ranking of their

15     arms, the yelling, and described that he is so loud and

16     crazy.  This prompted an immediate call to their mother, who

17     denied those actions and claimed the boys were lying.

18         Soon after I received notices of insufficient funds

19     checks written by Tracy and Derek.  However, currently --

20     however, currently they were enjoying new luxury cars, trips

21     to Hawaii.

22         In September of 2011 Tracy, being a school teacher by

23     profession, is off normal summers and we had agreed that I

24     would drop the boys off at her house while I worked a normal

25     8:00 to 5:00 40 hour week.

49

1    The first week of that summer when I had the boys in my

2    custody, Sunday night at 9:00 o'clock I get a text message

3    saying things have changed, you need to find your own day

4    care.  I'll call this game number one, because Derek is very

5    good at creating chaos.

6    As I scrambled to get day care -- I was able to -- the

7    boys would ask, Dad, can we go to Mom's, not day care?  Mom

8    lives close to their friends but the day care isn't.  I said

9    I'm sorry, son, but your mom said she can't, her and Derek

10   are too busy.  That's not what Derek tells us, Dad.  Derek

11   says you are the one that says we have to go to day care.

12   He is totally messing with a nine and ten year old's mind

13   and destroying their perception of who their father is.

14   August, 2011 I was notified by my son's -- I was

15   notified that my sons were signed up in a before and after

16   school day care.  Again another scenario.  I would drop my

17   kids off at the day care before school.  They would go to

18   day care after school.  I would pick them up.  Again, this

19   is the way to cost me money and cause havoc with my boys and

20   with their father.

21   In November, 2011 my sons were kicked out of the day

22   care that Tracy and Derek signed them up.  Two of the three

23   months they had bounced checks to them.  The staff related

24   to me that Derek is way out of control.  He does nothing but

25   scream at them on the phone, and therefore, will not talk to

50

1    him at all.  He is not a legal parent.

2        Derek responded with me as an email that he had

3    retained an attorney and that all communications from this

4    point on needs to go through her.  For two months I tried to

5    find that attorney, and that attorney never existed.

6    Another lie.

7        He began his terror towards me as I was questioning and

8    closing in on his game, and on January 3rd, 2012 -- I

9    remember it well -- I was sitting there listening to my boys

10   in great detail.  By this time, working in EMS for 18 years

11   as a paramedic, true firefighter -- not a fake one -- and I

12   have friends in law enforcement and I found out who Derek

13   Alldred was.

14       I called Tracy on speaker phone with my two sons, and I

15   asked, Tracy, what is going on?  The boys are telling me

16   about physical abuse, emotional abuse, verbal tirades,

17   mental torture.  And what is this, Derek recording the boys?

18       They, of course -- they were so scared of Derek, they

19   would lock their bedroom doors at night, so Derek took their

20   doorknobs off.  I said my nine and ten year old sons do not

21   have to live in terror.

22       Tracy and Derek denied all of his criminal past and

23   that his identity at the time was stolen by his 14 year old

24   daughter, Shelby's boyfriend, and what I was presenting is

25   all false.

51

1    In the report I found out that Derek was married to

2 another woman, Shannon Riley, and had a daughter Shelby.  I

3 drove up to Park Pines.  Before I would produce this

4 information to Tracy, I wanted to know is this really true

5 information.

6    In fact, I met with Shannon.  I met with Shelby.  I met

7 with Uncle Fuzzy.  I met with John and I met with Sheree,

8 all his other families.

9    Derek, of course, denied all the allegations and

10 claimed the boys were lying and that the information I

11 provided was false.  That was January 3rd.

12    Sixteen days later, as a father, I got a phone call no

13 father should ever get.  Kevin, your sons are missing.  I

14 called Tracy and I said, where are the boys?  I don't know.

15 I'll get back to you.  They're with Derek.

16    I immediately called -- well, I immediately bolted out

17 of my work and called the sheriff for a welfare check, and I

18 was met at 1225 Eastern Avenue where Derek was arrested on

19 parole violations.  He was on Sacramento's Most Wanted list.

20 He was booked without bail.

21    I then got my kids.  They went to school.  They were so

22 excited that he was in jail and gone.  In fact, the boys

23 were so relieved that he was gone, that their mother said he

24 is not coming back, ever.

25    As soon as he got out, he came right back to her house.

52

1    Why?  Why would a woman allow this man, who now all of his

2    identity that I said is proven and true, back into her life?

3         After speaking with Derek's parole officer, Ken Dixon,

4    I filed for full custody.  I witnessed the classic signs of

5    abuse to both of my sons, but mostly Jake, the aggressive

6    behavior.  I have emails where Tracy is asking me to talk to

7    Jake because he's out of control.  He didn't have any of

8    those tendencies when he was with me.  Mood swings, school

9    attendance.  Jake missed up to 90 days in a school year.  He

10   missed over 300 days in four years.  Remind you, his mother

11   is a school teacher.  Why is he missing all this school?

12        His school performances were all Fs.  He had not passed

13   a core class in four years now.  Feeling of helpless,

14   stopped playing all sports.  Both of my sons were number one

15   picks in baseball, number one picks in football.  I'll get

16   into more about that.

17        So May of 2012 Tracy tried to stop me getting full

18   custody and wanted to go to private mediation.  So Dr. Mary

19   Ann Frank interviewed Jake and Cody both.  They described in

20   great detail in a 38 page report that I have of the physical

21   abuse, the verbal abuse and these recordings that Derek

22   continues to take.

23        Derek's coaching Tracy to be meaner to the boys.  She

24   needs to be meaner, is what the boys told me, and that is

25   what is in Dr. Mary Ann Frank's report.  The fear that they

53

1   have in their mother's home is in that report.

2       Dr. Frank's recommendation was counseling and that

3   50/50 custody should remain because all kids deserve both

4   parents.  And I totally agree with that, in a safe

5   situation.

6       To protect my children, a trial was set October 4th,

7   2012.  The amount of stories and the severity of abuse that

8   my kids continued to tell me that summer are overwhelming.

9   They told me about the time when Derek pulled to the side of

10  the road as he was driving, screaming at the boys because

11  they're young boys and they were fighting in the back of the

12  car.  Repeatedly calling them stupid.  He blamed Jake

13  specifically.  You're the reason my daughter will not come

14  to visit.  Smashing their XBoxes.

15      The lies that were told to my son to influence their

16  perception of their father.  When my son asked me, Dad, can

17  I ask you why mom divorced -- you guys got divorced?  And I

18  said we grew apart.  I traveled a lot.  Remember?  I said

19  ten days out, four days home.  She thought she could do

20  better without.  No problem.  Well, that's not what Derek

21  said.  Derek said you tried to kill her.  Imagine looking

22  your 11 year old son now in the face and saying, Dad, you

23  tried to kill my mom?

24      Derek blames me why he was in jail with no bail.  In

25  court one time I asked the judge, please do not allow Derek

54

1    Alldred to be driving my kids around.  He does not have a

2    valid driver's license in California.  If you were behind in

3    child support, which at the time he was over $100,000 behind

4    to his daughter Shelby, they will suspend your license.  He

5    pulled out his license out of his wallet and he showed it to

6    my son and said see, your dad is an effing idiot, I have a

7    driver's license.

8        I questioned the behavior, but I didn't understand how

9    a true psychopath works, and without knowledge of other

10   major court battles that were already happening, the Sarah

11   Mundy lawsuit that was filed in December, 2011, and a

12   judgment of $175,000 against Tracy Santucci and Derek

13   Alldred.  That is awarded and recorded in the Sacramento

14   Court in February of 2013.  I have those documents as well.

15       Perhaps the reason that 1225 Eastern Avenue where they

16   lived, the house that her grandparents bought her, and the

17   foreclosure was going to lien, or is it because of the fake

18   documents that he is the executor of the Santucci Family

19   Trust and they took out a $250,000 equity line that they

20   defaulted on?

21       Delinquent notices were sent to the residence.  Final

22   notices were delivered.  All while Derek was in jail though.

23   They had a notice that the house was going to be auctioned

24   off in July of 2012.

25       Derek is a con man.  He moved into Tracy's house soon

1    after meeting her.  He gained the participation with the

2    Sarah Mundy scheme.  Tracy is listed as the manager of that

3    contract of a fake business.

4        He coached Tracy to be meaner to my son while he

5    videotaped it, only to be held over her head and ultimately

6    used against her.  The transcript, which I have with me, of

7    the Sacramento County Child Protective Service file states

8    that the video shows Tracy grabbing Jake, yanking him to the

9    ground and hitting him as he screamed stop, stop, stop.

10   That is CPS Report 0567100707697037318.  I have it with me.

11       So I would like to explain the leverage that Derek had.

12   That would explain the leverage that Derek had on Tracy, why

13   he was allowed to come back into her home after he was in

14   jail, after they lost their house, after all their Christmas

15   money was stolen, after all Tracy's mother's jewelry was

16   stolen, after Derek was caught with another woman at her

17   parents' house in Tahoe.  The list goes on, and all I could

18   do is wonder what does he have on her.  This is not -- not

19   good at all.

20       So anonymous -- then soon anonymous Fed Ex packages

21   arrived at my girlfriend's house, at my work, and the

22   football league where I was the president, with very false,

23   disparaging comments, with quotes, you need to do your due

24   diligence on Kevin Melder.  The same day Fed Ex packages

25   arrived at Derek's former in-laws, the Reillys, and at

56

1    Shannon's house.  Those he took ownership of.  He even

2    signed it.

3        So when I was talking with Fed Ex, comparing the

4    packages, the handwriting, the tracking numbers, the

5    location and that a credit card was used, they were

6    sequential, same credit card.  Just had a fake name and

7    address on mine.

8        It's obvious that Derek has launched a campaign to

9    destroy me and my son because we knew who he was and what he

10   was.  So in September, 2012 there was a pretrial conference

11   for our trial.  There, again, Derek had a fake medical

12   reason.  He had liver cancer and needed to have a liver

13   transplant.

14       I said he's up to something.  They're going to

15   blindside us again.  My sister is currently dying and did

16   die, and my two boys were denied coming to the funeral, of

17   liver cancer.

18       On October 17th I was clearing the table at my house.

19   As I reach for the plate, my son Jake postured like this in

20   a defensive mode.  I saw it.  My girlfriend saw it.  I asked

21   him, I said, Jake, please tell me, why did you do that?  Is

22   there somebody hitting you?  Jake immediately looked at his

23   lap and he was on the verge to tell, as I sought

24   professional help the next day with a counselor.

25       October 17th, I believe it was a Thursday, our custody

1    is a week on, week off, changing on Mondays.  So by Friday,

2    trying to get a counselor through the school, it didn't

3    happen.  Monday they went back to Mom's.  They were

4    interrogated.  Jake told them what happened.  My son Jake

5    did not attend school at all the following week.  In fact,

6    he was placed in a room and he was coached to say that I hit

7    him.

8          On October 29th there was an ex parte and I was accused

9    of physical abuse, the exact same way that the video in the

10   CPS report states, except for the name Father was submitted

11   in there.

12         Due to the physical evidence and the conflicting

13   stories and the allegations, there was -- it was unfounded.

14   There was nothing.  Just a story.

15         Derek and Tracy's scheme of the false allegations and

16   parental alienation was another revenue stream for him.  She

17   has full custody.  I'm paying copious amounts of child

18   support.  That scheme lasted until October 25, 2017, when

19   the Judge finally granted 50/50 custody again.

20         November, 2012 Derek and Tracy were evicted from their

21   home that was auctioned off in July.  They were hiding in a

22   hotel.  His parole officer, Ken Dixon, called me and said

23   do you know where Derek is.  I said I sure wish I did,

24   because I was looking for him as hard as his parole officer.

25         My kids had been missing for 38 days, but at this time,

58

1   because of the ex parte, she has full custody, I'm on

2   supervised visitation and there's nothing I can do.

3       The boys were told by Derek the reason they had to move

4   out suddenly is that I sabotaged the electrical system in

5   their house and that I had their house bugged.  Not true at

6   all.

7       After this, Derek was on the run pending charges for

8   elder abuse.  Ken Dixon informed me about the home equity

9   line, told me the whole scheme they did, the false

10  documentation.  Charges were not filed because it implicated

11  Tracy as well.

12      My sons were uprooted seven times in three years of

13  this man's terror, seven times.

14      The dog Max that you may hear about or have heard

15  about, that was my dog that I bought for my boys.  He was a

16  purebred boxer.  Lucy was a purebred boxer.  The boys were

17  told those dogs fled when the gardener didn't close the gate

18  properly.  Not true at all.  I have the Sacramento SPCA

19  report.  Those dogs were euthanized when they were evicted

20  out of their house.

21      So my sons now lost their dog, they lost their house,

22  they lost their dad.  So without any explanation, my boys

23  have no idea what's going on.

24      And you want to talk about people that have trust

25  issues?  My two sons right now.

59

1      During supervised visitation, my son Jake that I

2   apparently abused laid his head on my lap and he said, Dad,

3   quote/unquote, I just want to come live with you.  I don't

4   want to live with Mom and Derek.  That's in Nick Zamorano's

5   report.

6      The trail was derailed with the chaos that Derek has

7   created and the deceptions and lies.  Derek called me from

8   drug rehab.  He is the one that in fact told me about that

9   CPS report of Tracy beating the boys, because he turned over

10  videos -- those videos that he always recorded my boys and

11  he coached Tracy to be meaner.  He told me he gave those to

12  his counselor, Abby Lockett.

13      Knowing who Derek is, I called CPS to confirm.  They

14  said yes, there is an open CPS case.  I called the rehab

15  center and I asked to speak to Abby Lockett.  She no longer

16  works there and is gone.  Same day.

17      I ask you now, Your Honor, if you could please find

18  where those tapes are, because they are nowhere to be found

19  right now.  Those tapes alone can shed light on the verbal,

20  emotional, psychological, social and physical abuse that my

21  sons endured during Derek's time.

22      The next four years have been a result of his abuse and

23  lies.  Again, from 2013 through 17, 300 days of missed

24  school.  He never passed a class in four years.  Jake has

25  resorted to drugs to cope with the trauma caused by Derek.

60

1    In September, 2017, I received an email that Jake was
2    committed to a psychiatric hospital on suicide watch.  I
3    went down to the hospital.  The truth came out of what's
4    going on.

5    Tracy abandoned him.  She filed paperwork.  He's a
6    hundred percent custody of mine.  Wants nothing to do with
7    him.  We went the next day and picked up his clothes off the
8    front line.

9    As we started his life over at my house, three months
10   into it, Stockholm syndrome kicks in.  Jake wrote me a
11   beautiful note, and I posted it on social media because I
12   was a proud father.  Two days later he goes back to Mom's.
13   Afterwards I see the text messages on the phone from the
14   mother and grandmother.

15   Cody has lived with me full time for seven months now.
16   I stand here under oath, and I have never abused my sons,
17   yet the damage to my sons, to carry out his plan.

18   I sat with my son Cody on August 1st of this year and
19   he had finished his first year of summer school.  Cody was
20   an honor student.  He was in the honor classes.  He's in an
21   engineering class as a freshman.  He never had anything less
22   than a B, but with the reign of terror of Derek, he's unable
23   to focus.  He failed his class for the first time.

24   As Cody, living with me, knew I was coming here and
25   when I was asked to write an impact statement, I had to

1   research it.  I didn't even know what it was.  I researched

2   it and I thought, I'm a grown man.  This has impacted me

3   severely, but it's impacted my kids the most.  They're the

4   ones that should be standing here right now so they can look

5   at him, look him straight in the eye and let him know.

6        So Cody told me, says, Dad, you know what happened.

7   This is Cody's quotes to me:  I was a happy person with lots

8   of friends.  I loved sports.  I loved school.  I made

9   friends easily.  But after Derek, that all changed.  I lost

10  my friends.  I haven't played any sports.  I don't like

11  school anymore.

12       Cody said that's a lot, but just make sure you tell the

13  Judge everything.  And I said, is there anything else?  He

14  says, Dad, I know you're innocent.

15       I never got to talk to Jake because Jake, with the

16  Stockholm syndrome, has gone back to his mother's, has

17  resorted to marijuana.  I've seen it on his Snapchat.

18       Another blindside, on Thursday when I stepped on a

19  plane to come here, I got off the plane to a message that

20  there's an emergency hearing, that the mother wants to take

21  full custody of the kids while I'm here, knowing I'm unable

22  to attend that hearing.  Derek trained her well.

23       She's trying to send Jake to a boys ranch in Washington

24  at the cost of $4200 a month and a $1500 admission fee.  She

25  said he's out of control and can't control him, per her

62

1    declaration that was emailed to me while I'm here.

2    Yesterday I was on a hearing from 1:15 to 3:15.

3         To summarize the impact Derek has had on my family, I

4    lost one job because of the distractions.  Every time I came

5    back from court, the whole office wanted to know what was

6    going on, because some of the stories are so unbelievable.

7         I did lose my girlfriend that he mailed the package to

8    because it got a little bit overwhelming for her, and she

9    said I'm scared because he knows where I live now.

10        His plan to mentally torture my sons and create a false

11   allegation and parental alienation to get child support as a

12   money stream, as he had a money stream coming in from Sarah

13   Mundy, he had a money stream coming in from a false home

14   equity line.

15        Just because Derek will never be Shelby, his daughter's

16   hero, he purposefully destroyed my son Jake and Cody's hero.

17   The three years of supervised visiting, the lawyers, the

18   loss of work has cost me over $350,000, and as we all know,

19   it's not over.

20        As my now 16 year old son, because of the post

21   traumatic stress, is looking at a boys ranch at $4200 a

22   month, the amount of counseling, the amount of supervised

23   visitation that will be going on and on and on for years.

24        For seven years now my sons lived with fear and the

25   abuse he's caused.  As both of the boys were removed from

63

1   sports and baseball, because I was their coach -- it was

2   part of the way to drive a wedge.  Derek would tell my boys,

3   your dad is a shitty coach.  My boys, both Jake and Cody,

4   lost the opportunity of a championship season, both of them.

5        Cody has been doing extensive counseling and his

6   counselor, quote/unquote, he is really traumatized and shows

7   extreme signs of PTSD.  He is 15 years old.

8        The time that you stole from me and my sons has

9   continued and is priceless to me.  The storm that he has

10  caused in my life is unforgivable, but the storm he caused

11  to my sons has impacted them and will impact them forever.

12  They were nine and ten and they're 15 and 16 now.

13       Derek is nothing short of a psychopath.  He idealizes,

14  he devalues and he discards.  He did that to my sons, my

15  minor sons.  He is diabolic.  He will repeat the torture

16  upon someone else, someone else's children, someone else's

17  family if he's ever released.

18       I ask the Court to please, for all the abused children

19  out there and for my sons and now myself going to

20  counseling, special counseling on how to deal with a PTSD

21  child is incredible.  So for my sake and anybody else's

22  sake, Your Honor, please don't let this man out.  Thank you.

23            THE COURT:  Thank you, sir.  Mr. Tatum.

24            MR. TATUM:  Yes, Your Honor.  Wendy Harvey.

25            THE COURT:  Ma'am, if you'll state your name for the

64

1    record.

2            MS. HARVEY:  My name is Wendy Harvey.

3            THE COURT:  Thank you, ma'am.

4            MS. HARVEY:  I own a marketing agency focusing on

5    social media.  I've been in this industry for ten years.  I

6    assure you that the skill set that Derek Alldred has when it

7    comes to social media technology is far advanced.  The

8    websites, the pdfs of legal documents, the screenshots that he

9    created and the Google apps that he used to carefully construct

10   his storyline was nothing short of genius and brilliant.

11        Derek Alldred has proven to be a con artist, even after

12   serving time.  He continues to con women because he knows

13   the law is gray with stealing money when you're in a

14   relationship with someone.

15        It's shameful that even though I searched at the time

16   five years ago, because I had suspicions, nothing showed up.

17   I Googled.  I even hired a private investigator, who didn't

18   uncover anything except someone suing him and multiple

19   evictions and multiple addresses for him, but nothing deeper

20   than that.

21        He has shown zero remorse for his actions.  He's a

22   master manipulator.  He will go to unimaginable lengths to

23   steal money from women.

24        He should be given the maximum sentence, because I have

25   no doubt whatsoever, as soon as he's free, he will just do

65

1   this again.

2        I live in Hawaii.  This happened to me five years ago.

3   I have seen him continually get out of this, but I came here

4   today all the way from that state to try to hopefully see

5   that justice is served.  Thank you.

6                THE COURT:  Thank you, ma'am.  Mr. Tatum.

7                MR. TATUM:  Yes, Your Honor, JoAnn Venhuizen.

8                THE COURT:  Ma'am, if you'll just state your name.

9                MS. VENHUIZEN:  JoAnn Venhuizen.

10               THE COURT:  Thank you, ma'am.

11               MS. VENHUIZEN:  First, I want to thank you and the

12   court for allowing me and these beautiful women and Kevin the

13   opportunity to hear our voices.  We deserve this opportunity,

14   so thank you.  Thank you for considering our pain, our

15   physical, emotional, mental, social, spiritual and, yes,

16   financial hurt.

17       For me, Derek was this dream come true.  And like most

18   dreams, they're not real.  Instead, unfortunately, this was

19   a big, outrageous fantasy, full of lies, deceit and hate.

20       Like you've already heard from Kevin and the women

21   before me, it destroys.  What he does destroys.  It takes

22   your security, takes your sense of trust.  It causes you to

23   feel super uncomfortable in your own skin, in your own home,

24   in your own work place.

25       All the while, you're wondering, is this my fault?  Did

1    I do something wrong?  You lose the ability to function and

2    you feel -- you feel everything.

3        My hope for today, sir, is that the truth -- oh, that

4    word -- the truth will continue to reveal itself, for me,

5    for these women, and that justice can be served and that

6    freedom -- oh, that we can experience freedom -- freedom

7    from Derek, freedom from this story, freedom from the hurt.

8    Thank you.

9              THE COURT:  Thank you, ma'am.

10             MR. TATUM:  Yes, Your Honor.  Michael Schmotter.

11        Can I have just a second, Your Honor?

12             THE COURT:  Yes.

13             MR. TATUM:  It will actually be Kimberly Schmotter,

14   Your Honor.

15             THE COURT:  Very well.  Ma'am, if you'll just state

16   your name.

17             MS. SCHMOTTER:  Kimberly Schmotter.

18        I guess I first met Derek in November of 2013, on a

19   dating site, like everybody else did.

20        Just like everybody else, he just doesn't randomly hurt

21   people.  He researches carefully and he picks everybody

22   carefully as well.  He builds his profile so that it is just

23   the perfect fit.

24        He was a triathlete like me, enjoyed surfing, enjoyed

25   cooking.  You know, he's just your perfect match.  He was an

entrepreneur, a financial partner in a firm called Johnson
Alldred & Murphy.  I was an entrepreneur.  I had an
anti-aging business in Maui.  I was opening a new medi-spa.
So, I mean, it's a dream, right?

Like me, he had a daughter who he stated he had custody
of but she was staying with her grandmother in California at
the time.

Of course, when I met him, he was charming and quite
convincing.  That's the way he is when he meets everybody at
first.

I was currently building a new practice.  I was getting
a financial loan, and I was kind of swept away.  Because he
was a so-called financial specialist, he advised me against
taking my loan and financing the project through me.  Big
mistake, of course.  He showed me bank accounts reflecting
worths in millions from Chase Bank.  Stocks that he
supposedly owned.

I did some background checking.  I wasn't stupid, or at
least I didn't think I was.  I checked Facebook, LinkedIn,
business websites, including reviews.  I even went to the
extreme of checking the roster of the University of
Minnesota hockey team from the year he stated he played for
them until he sustained a career-ending injury, and I found
his name even on the roster.  I still don't know how he did
that.  I guess I did a fair share of checking.

1      Given his wealth of experience, I chose to let him --

2  let the loan go and trust financing to him, which of course

3  didn't turn out.

4      By February I guess the relationship went pretty

5  quickly.  After all, he was my perfect match.  His closing

6  on his home, of course, fell through for some reason or

7  another, and he was basically living in my home by February.

8      He had taken a role as my business manager as well as

9  paying bills for my property.  He had also proposed marriage

10  and we set a date for July.

11      This is about the time things start to crumble, just

12  like it does for everybody else.  I start to hear from

13  family members that they have been trying to reach me.  I

14  check my phone.  There's no messages.  There's no missed

15  calls, so I can't figure that out.

16      In the meantime, we're placing an offer on a home in

17  Maui.  And I'm, of course, under the impression everything

18  is going fine with that.

19      At this point I'm starting to have some realization of

20  what's going on.  My dad tells me that my mail has been

21  forwarded, and I can't figure out why.  So none of my mail

22  is coming to my parents' house, which is where I have all my

23  mail going in Minnesota.  My dad says he's opening a piece

24  of mail and finds that a credit card that hasn't been used

25  is double its max.

69

1    In addition, now I'm starting to receive some calls

2  from creditors stating I haven't paid accounts in months,

3  even though Derek has been supposedly using funds from our

4  bank account to pay these and I've been getting receipts

5  from him saying that they have been paid, while they're all

6  false.

7    Now I'm also -- he's also given me proof that my car

8  was supposedly paid for.  Bills, all this is fraudulent.

9    At this point Derek never leaves my side.  I can't have

10 a private phone call.  I can't reach out to anybody to find

11 out more information.

12    The end result, I come home one day.  My home in Hawaii

13 is taped up.  My electricity is turned off.  I have

14 thousands of dollars of product in my house because it needs

15 to be refrigerated.  All of it is ruined.

16    During this time of awakening, I also find out that he

17 illegally breached my computer account from my other work,

18 which is in Minnesota.  He signed me up for a bunch of

19 shifts and asked for advance payment.  He got the advance

20 payment and never intended on me ever showing up for those

21 shifts, so it ruined my reputation as a physician in

22 Minnesota.

23    At this point, my Hawaii business is forced to close

24 because I have so much debt for product that I thought was

25 paid for and is not paid for and is ruined.

1        Now more letters are starting to appear at my father's
2   house, making me more aware of the amount of deceit and
3   fraud, letters regarding bounced checks, up to $35,000 in
4   bounced checks that he wrote, maxed out PayPal accounts.  I
5   had $50 on a PayPal account that's now $5,000.  All in all,
6   there's over $35,000 in fraudulent checks, $60,000 in
7   fraudulent credit, $28,000 for advanced pay in work I
8   haven't done, not to mention about $50,000 in product that
9   is lost.
10        And the reason I'm not receiving calls, he somehow
11   forwarded all my phone calls to his phone, so he's forwarded
12   everything to him.
13        He's also managed to capture all messages from my email
14   account, directing them to him as well.  So he basically has
15   held me hostage for months without me being aware.
16        Each time I even mention at this point leaving, he
17   threatens me, saying he's going to ruin my career as a
18   doctor and that I will never practice medicine again and
19   he will make it so I can never see my kids again.
20        At this point I get ahold of my dad, who tells me I
21   need to leave.  But I'm not the type of person who likes to
22   be threatened.  So even though I know I have nothing and I
23   know the type of person he is, I say I'm not going to leave
24   until I see a little bit of jail time for him.
25        So we're supposed to go to the Caribbean in the spring

71

of that year.  We end up in Puerto Rico, not where we're

supposed to be.  We end up being there for two weeks.

There's no hotel.  We ended up staying with locals.  I have

no money.

I think he's pretty much there to leave me there.  I'm

scared.  We get to the airport to come home.  I try to run.

I flag down a car and he runs in front of it.  So I figure

I'm pretty much stuck with him getting me home or I'm not

going to get home at all.  My parents are about to report me

as a missing person.

So I do get home to Minnesota.  So at this point in

time I know he's stealing checkbooks and I know about what's

happening with my credit cards, so what I do at that point,

I leave some of my checkbooks out on purpose.  I report them

stolen before he uses them.  I call hotels that I know he'll

be staying at, let them know he'll be using a credit card

fraudulently.  It doesn't work.

So eventually he finally got behind bars.  I arranged

to meet him at a hotel.  I knew the St. Paul Hotel had a

warrant for him and I notified them which hotel he was at,

and that's when he got arrested in Minnesota.

Unfortunately, when I met with the police, they told me

it wasn't worth pursuing my charges because the amount of

money he owed me, I would never get my money back, they

said, because he spent it all.  And the monetary value of my

1    claim was less than a million dollars, and because of that,

2    the feds wouldn't pursue it.  And because he bounced from

3    state to state to state, the charges in each state was never

4    a million dollars, so they would never pursue it.  He would

5    never see today.  He would never see today happen.

6        And for the next couple of months he does right as he

7    promised.  He haunts me from behind bars.  He sends emails

8    pretending to be patients and threatening me.  He proposes

9    false claims and report them to Better Business Bureau and I

10   have to respond to that.  So I don't know how you do that

11   from behind bars, but you do.  So he continues to threaten

12   to take my license away, just like he always promised.

13       So how do you pick up the pieces?  I'm thankful I'm a

14   physician and I have a supportive family.  But what if you

15   don't have my means?  A lot of these women here, their lives

16   are ruined.

17       I moved into my parents' house.  I had no car.  That

18   got repossessed.  I had six dollars to my name.  It had

19   ruined my reputation.  I had to move out of state.  I moved

20   to Wisconsin.  I couldn't be a doctor in Minnesota.  I had

21   media at my door, because he went to jail.

22       My reputation was ruined, so I moved to another state.

23   I had to collect a signing bonus.  I had to try to pay back

24   some of my debt.  I had to hire a fraud attorney, a

25   bankruptcy attorney.  I bankrupted my business.

73

1          To this day I still can't qualify for a credit card.  I

2     can't refinance a home.  I was fortunate to get a CD.  My

3     business in Hawaii, which was my dream, that's gone.  I

4     tried to rebuild my business in Minnesota.  Wasn't able to.

5     That's soon to close.

6          I still have nightmares where I'm running from him in

7     Puerto Rico.  I didn't know if I was going to come back at

8     all.  I have anxiety.  I panic every time his name comes up.

9     Today was hard enough to come.  This statement was one of

10    the hardest things I ever wrote.

11         In my mind it's the emotional casualties.  You can't

12    put a price on it.  No punishment is ever enough for the

13    damages are irreparable.

14         Derek is -- he's not a sociopath.  He's pure evil.  He

15    doesn't collect medals or badges like he portrays in these

16    various identities.  He collects his pride and the pieces he

17    creates when he shatters women's lives, and that's what he

18    collects and he takes pride in it.

19         He can't be put away for long enough.  If he gets out,

20    he's just going to do it again.

21         And as far as his prognosis for therapy, being a

22    doctor, it's not just guarded.  These type of people can't

23    be healed.  No amount of therapy will fix him.

24              THE COURT:  Thank you, ma'am.  Mr. Tatum.

25              MR. TATUM:  Vanessa Cabello, Your Honor.

74

1          THE COURT:  Ma'am, if you'll state your name.

2          MS. CABELLO:  Vanessa Cabello.

3          THE COURT:  Thank you, ma'am.

4          MS. CABELLO:  You're welcome.  I appreciate the

5    opportunity, Your Honor, the opportunity to expose the truth.

6          I try to make sense of all this, this being all of the

7    women he has harmed and affected.  For the women that have

8    spoken up here today and for all the women who have not had

9    the ability or opportunity to speak up, I want my voice to

10   represent those women:  Victims whose lives have been turned

11   upside-down due to Derek, the sociopath, the professional

12   con artist.

13         I ask that Derek is properly dealt with so he doesn't

14   get loose and victimize other women in the future.  You see,

15   I believe that swindling for Derek is like a drug.  Every

16   time he gets away with it, he has a deeper desire to do it

17   again.  And in my opinion, he has been quite sophisticated

18   about it.

19         Sometimes people who are adopted struggle with their

20   existence.  I believe Derek was one of them.  That struggle

21   has bled so deeply into him, he suffers from God knows what

22   illnesses and diseases, but my impressions would be

23   something like manic depressive and a compulsive liar, and

24   that's from an early age.

25         You see, I knew Derek in the '90s when I went to UCLA

75

1    and he pretended to be a medical student, and I have not

2    seen him since then.  So this is very emotional for me and

3    traumatic, to come all the way out from Los Angeles and stir

4    these emotions up again.  I had tucked them away, thought

5    that I would be okay.  But you see, here I am, still

6    affected by it.

7        I don't think that Derek understands the fundamental

8    difference between lies and the truth.  Not only is he a

9    serial liar and a swindler, he's a fundamental narcissist.

10       His parents were very doting on him and tried to make

11   up for the fact that he was adopted.  Maybe that's why

12   pretending to be a medical student was easy for him, and all

13   those other things, like a firefighter, hotel investor,

14   Naval officer, NCIS agent.  That's pretty darn

15   sophisticated, Your Honor.

16       I must say it's hard for me to trust people after what

17   I've been through.  Your Honor, if allowed, Derek will

18   strike again.  For this reason, I would be comforted knowing

19   that Derek will serve at least his minimum sentence, if not

20   more.  He must be stopped from ruining other lives.

21   Thank you, Your Honor.

22            THE COURT:  Thank you, ma'am.  Mr. Tatum.

23            MR. TATUM:  Your Honor, we have no further victims to

24   provide allocution.

25            THE COURT:  Thank you.  Mr. Arrambide, if you and

76

1    your client will take the podium again.

2        Mr. Arrambide, if you would like to comment.  You said

3    you wanted to wait and give your response.

4            MR. ARRAMBIDE:  Yes.  Thank you, Your Honor.

5        Your Honor, I believe earlier Mr. Tatum stated that all

6    these individuals had normal, happy lives before Mr. Alldred

7    appeared in their life, and I'm not sure that's -- at least

8    what I heard today and certainly not what I've seen in the

9    statements.

10       We're living in what at least I think are extraordinary

11   times.  We have the "me too" movement.  We have Harvey

12   Weinstein and his problems, and it seems like now we live in

13   a time where a spurious allegation is enough.  Just an

14   allegation that's out there is enough, and it's going to be

15   followed through and people's lives are ruined.

16       And certainly Mr. Alldred has ruined his life on his

17   own, but then everybody seems to be piling on, and I'll give

18   you a few examples of that.

19       You know, we had Mr. Melder come here, who Mr. Alldred

20   didn't take any money from.  He's not here for -- for

21   getting involved in a child custody battle.  He's here for

22   fraud.  Yet, for years Mr. Melder has been harboring this

23   animus towards Mr. Alldred because he was married, for a

24   time, to his ex-wife.  And, you know, why is he here?  Why

25   is he here foisting all of that garbage onto the Court and

77

1   onto Mr. Alldred?  I mean, he lost custody of his children.

2   That's why he's here.  He's upset about that.  And, you

3   know, I would suspect, knowing what I know about family

4   custody law, having been involved in that in the Navy for

5   quite a few years, those kids are a product of a toxic

6   divorce most likely, and yet he comes in here today saying

7   these kids are still being manipulated by Mr. Alldred, who

8   hasn't been in their life since 2013.

9       Why would Mr. Alldred file a case with the Child

10  Protective Services against his wife and against Mr. Melder

11  if he was -- if his aim was to get child custody money?  The

12  two are inapposite with each other.  It doesn't make sense.

13      So here he is trying to blame Mr. Alldred for all the

14  problems of his toxic divorce and the child custody issues

15  that surely those two individuals are going through.  Since

16  Tracy apparently filed an emergency motion while he was

17  gone, it's still toxic to this day.

18      Ms. Pardini comes here and she's been on this, for lack

19  of a better phrase, jihad against Mr. Alldred since they

20  met, according to her own statements, statements she's made

21  to the police, statements she's made to the press from what

22  I can tell, statements she's made to anyone who will listen.

23      She met Mr. Alldred on social media and invited him

24  into her home.  She knew his name was Derek Alldred.  He

25  never used any other name.  His name, in fact, appears on

78

1   her credit card statements, and she makes all these claims

2   about he took all this money.  Yet when there's proof from

3   American Express saying that $26,000 of the money that he

4   spent on the card that was authorized on her account was

5   taken off her account, she still insists that it's not

6   there.  She's -- you know, she wants the cake and she wants

7   to eat it too.  Either the $26,000 was taken as she says, or

8   American Express gave it back, as they say.  I'm more

9   inclined to believe American Express than her ranting and

10  raving.

11      Now, according to her statement, they went to Lake

12  Tahoe.  They stayed at the Ritz-Carlton.  They had a fight.

13  She goes into great detail about all of that.  She fails to

14  mention that she was highly intoxicated, according to the

15  staff at the Ritz-Carlton when that fight occurred, and yet

16  this person who she's so afraid of, who she's -- she tells

17  the hotel staff at the Ritz-Carlton that she's in fear for

18  her life, get him out of this room, get him out of my room

19  she says, and he leaves.  He goes to another hotel.

20      She's so afraid and so terrified by this man and

21  everything horrible that's happening that the next morning

22  she picks him up at the hotel, the other hotel, and takes

23  him back to San Francisco to her house.  These things just

24  don't make sense, Your Honor.

25      Sure, he's a man who has defrauded a great many people

79

1  out of some money, but then he's also someone who has sweet

2  talked his way into people's lives and never defrauded them,

3  and yet they still harbor an incredible amount of animus

4  towards him.

5       I believe it was Ms. Brandt who says that her

6  livelihood has gone from $47,000 a year to $29,000, but he

7  never took any money from her, and yet she's still here

8  because of the emotional feelings that have occurred because

9  he got into her life based on falsehoods.

10      Your Honor, every day of the week, every hour of the

11 day, people enter into relationships under false pretenses.

12 He did that.  He didn't take money from many of these people

13 who harbor all this ill-will and animus and say their life

14 was so impacted by his false pretenses.  And so they're

15 trying to paint the picture of someone who is not nearly as

16 bad a human being as they would lead you to believe.

17      The last person we heard from, who knew him in 1992,

18 admits in her own statement that she lent him the money.

19 And, yes, he's a horrible boyfriend.  She knew his mother.

20 She tried to get the money back from his mother.  She loaned

21 him money when she was a struggling student.  Well, you

22 know, that's what happens when you're in a relationship and

23 you make bad decisions.  You loan money people money and

24 they don't pay you back.

25      He didn't steal from her.  He didn't weasel it out of

80

1     her.  He just sweet talked her out of it.  And here she is

2     all these years later harboring on this animus, trying to

3     paint him to be the worst person on earth.

4         They're asking for a sentence the likes of which the

5     Enron fraudsters didn't even receive.  And, you know, they

6     destroyed the lives not just of a few people, but they

7     destroyed the livelihoods and retirements of countless

8     victims who held Enron stock, and they're asking for that

9     kind of sentence, Your Honor.  And in this case we're

10    talking about a couple hundred thousand dollars.

11        But mainly what we're talking about is all their

12    vitriol and all their animus based on the fact that he wooed

13    them, he courted them, he swept them off their feet in some

14    of their statements, because they fell in love with him and

15    it was under false pretenses, and they're really upset about

16    that.  That's what's really driving all this in this case.

17    It's not the money.

18        So we live in these times when -- when someone can say

19    this producer did this to me and suddenly their career is

20    over.  This other person did such and such to me.  And

21    finally we've got I think this week one of the Weinstein

22    accusers is now accused of sexually assaulting somebody

23    else.  And so it appears that they're starting to eat each

24    other, at least in Hollywood.

25        So here we are trying to decide what sentence is

81

1    appropriate for Mr. Alldred.  It's -- I don't want to

2    abandon my objections, but in light of the rulings that the

3    Court has made, he's looking at about -- from my

4    calculations, certainly the Court I believe should run the

5    two identity thefts concurrently, because the Court is

6    capable of doing that.  The law allows for you to do that.

7    They must be consecutive to the other sentences, but they

8    can be concurrent with each other.

9         And so I believe a sentence, again not wanting to

10   abandon my objections, but in light of your rulings, I think

11   a sentence in the 14 to 15 year range is appropriate.

12   Certainly not as high as 20 years.

13        And so looking at that, if you take the -- and I'll

14   have to get my sentencing -- 162 months certainly on the

15   financial fraud case, with 24 months to follow, for a total

16   of 186 months I believe is more than adequate, Your Honor.

17   That is the high end of the range.

18        But certainly Mr. Alldred, given the monetary amount,

19   certainly doesn't deserve a 20 year sentence plus another

20   four years on top of that.  That's just -- that's just

21   completely outrageous.  And as I said, that's in excess of

22   what the Enron characters got.  And this being so much

23   smaller than the Enron fraud, I would -- I would ask for no

24   higher than that sentence.

25              THE COURT:  Thank you, Mr. Arrambide.

82

1      Mr. Tatum, we kind of reversed the order.  Usually --

2 because you had your motion, I took you first.  Did you want

3 to make any response before I call upon the Defendant?

4            MR. TATUM:  Your Honor, I think the arguments we made

5 in our motion for upward departure were all the same arguments

6 that we would have made when asking for the sentence.  And we

7 do, again, reurge our motion and ask for the maximum sentence

8 in this case.

9            THE COURT:  I understand.

10     So, Mr. Alldred, you have the right to address the

11 Court prior to sentencing.  Now is your opportunity to say

12 anything you would like to say to the Court.

13            MR. DEREK ALLDRED:  Okay.  Your Honor, I -- couple of

14 things I would like to say.  You know, 15 months ago if you and

15 I were to sit here and have this conversation, I would

16 probably -- probably have something different to say and to

17 tell you.

18     You fast-forward 15 months and here we are, and, you

19 know, I'm -- at the least right now, you know, to say I'm

20 mortified and I'm embarrassed and I'm shamed and I'm sorry

21 doesn't begin to capture really how I feel.

22     You know, the harm that I've caused some of the people

23 behind me, it -- it -- I know the money is really

24 inconsequential to a degree, and a few of them have touched

25 on it and it goes to the -- it goes to the core of their

83

1    trust for people.  And I can tell you whole-heartedly, I

2    never, ever did anything to -- I never wanted to hurt

3    someone's trust like that to where they would leave me and

4    move on about life and have that type of deficit.  You know,

5    that's the -- that's kind of the cross that I'm going to

6    carry and -- and to those people, I'm very, very sorry.

7         You know, the -- I certainly didn't expect to come here

8    today and be let go.  I didn't expect to come and get a

9    light sentence.  My expectations were really pretty simple,

10   which was to be able to come here and at least address the

11   people behind me and address you and tell you that I am

12   sorry.

13        And, you know, I hope at this point that the victims

14   behind me can have some peace now, go back home and move on

15   about their lives with a little more -- a little more peace

16   than they've had the past three, four, five years, or even

17   in someone like Vanessa's case where it's been 25 years.

18   You know, hopefully this -- hopefully this brings some

19   closure to that.

20        So I'm sorry, and that's all I have to say.

21            THE COURT:  Mr. Alldred, I do have just one question,

22   because you made a comment that said you would have said

23   something different to me if you had been here 15 months ago.

24   I'm just curious, what would you have told me -- if you care to

25   share it, what would you have said to me 15 months ago if you

84

1    had been before me for sentencing?

2         MR. DEREK ALLDRED:  Honestly, I think I would have

3    said I'm sorry, but I probably would have said I'm sorry

4    because I was caught.

5         You know, it's easy to get into situation like this, if

6    you've never -- if you've never been in it, and when you get

7    caught and you're put in handcuffs, everyone is going to be

8    sorry, but for all the wrong reasons.

9         You know, that wore off about four or five months ago

10   when everything -- the reality of what I've done really

11   starts to sink in and you start talking with professionals

12   about it, you know, it's no longer about that with me.

13        You know, getting caught is a byproduct of -- of doing

14   what I did, but being sorry now just takes on kind of a new

15   meaning and a new life.  So that's the difference.

16        THE COURT:  Thank you.  Any reason why the Court

17   should not pronounce sentence at this time?

18        MR. TATUM:  None from the Government, Your Honor.

19        MR. ARRAMBIDE:  No, Your Honor.

20        THE COURT:  So first let me state that -- and I

21   always say this when I'm doing sentencing.  Sentencing is the

22   most difficult thing this Court does in its job.  I find it to

23   be the most difficult part of my job.

24        Of course, the first step of the process is to

25   determine what the appropriate guideline range is.  We've

1    done that in this case.  I know Mr. Arrambide had objections

2    that I overruled, but that's our first step in the process.

3         But ultimately my obligation is to determine what the

4    appropriate sentence is for each defendant, using the

5    guidelines as a starting point.  And this sentence should

6    not be greater than necessary to accomplish the purposes of

7    the guidelines as set forth in 18 USC Section 3553(a).

8         In reaching the sentence today, I have fully considered

9    all the ramifications of the guidelines.  I've looked at the

10   nature and circumstances of this offense.  I've considered

11   the need for deterrence and promoting respect for the law

12   for others that might be considering this offense, and to

13   promote respect for the law by the Defendant.

14        I've also considered the need to protect the public

15   from further crimes of the Defendant.  I've considered the

16   Defendant's history and characteristics, and I've also

17   considered the victim statements and their statements today.

18        Now, in considering a non-guideline sentence, what I

19   would call a variance, the Court looks at the factors set

20   forth in Section 3553(a) to determine whether it should

21   deviate from the advisory guideline range, and in your case,

22   Mr. Alldred, I believe an upward variance is warranted, and

23   I find the guideline range is not sufficient in this case.

24        And I would note that I know, Mr. Arrambide, you

25   started off your comments talking about the "me too"

86

1    movement and that nature.  I don't think these are

2    comparable at all, in my mind.  We're not comparing apples

3    to apples at all, because although this is a gentleman who

4    was defrauding women in these relationships and causing

5    fraud, other than maybe one situation, it's not a situation

6    where someone is being harassed by someone in a superior

7    position or anything like that.  I just don't see that to be

8    the same thing.

9         So in looking at my reason for granting an upward

10   variance -- and, of course, I can grant the Government's

11   motion as well in terms of their request for a departure

12   upwards, or again, what I would call a variance.  But

13   irrespective of whether I granted that or not, I still would

14   do an upward variance and these are the reasons.

15        Based upon your lengthy history of committing fraud and

16   identity theft, you have pretended to be many different

17   people in many different professions, all with the intent to

18   commit fraud against these various people, and some have

19   spoken today.

20        You have assumed identities and personalities to

21   defraud the individuals out of, some of them, large amounts

22   of money.  In all likelihood, the totality of your criminal

23   conduct has yet to even be discovered.

24        Your pattern of behavior of traveling with the sole

25   purpose of committing fraud, and many of these trips were

87

1   taken really on the victims' -- you know, the cost of the

2   victims, them not knowing they were actually paying for it

3   because you opened up fraudulent accounts in their name.

4          You also -- in reviewing the Presentence Report, you

5   have a pattern or it looks like the inability to ever tell

6   the full truth.  There are multiple examples of falsehoods

7   to agents about your family and your past.  You denied

8   wearing a military uniform, but when you were confronted

9   with images of wearing the uniform, you still wouldn't admit

10  that you did that.

11         You gave false information about your employment

12  history and residences.  The probation officer in their

13  report found that you were untruthful for most of the

14  presentence interview.

15         Of course, we've discussed about the issue whether

16  you're legally blind or not.  The problem the Court has with

17  that statement is that you have been driving.  None of the

18  victims reported you having difficulty with your eyesight.

19  And again, you didn't complain about any eyesight issues

20  when you first got to the jail.  It was only after the

21  Presentence Report was done that this issue came up.

22         You have made no claims of any kind of mental illness

23  prior to your arrest, but then claim that this was all --

24  well, at least through the presentence report, claiming that

25  this was part of the problem after your arrest.

88

1      It also looks like your employment history appears to

2  be completely falsified.

3      Also, the -- and I deal with fraud cases all the time.

4  The victim statements in this case were completely unique to

5  what I usually see.  They all tell a similar story about how

6  they got involved with you and how you got involved with

7  their lives and committed fraud, but what was different from

8  these fraud victims from the ones I usually see in fraud

9  cases is that in all the victim statements I looked at and

10 even their statements today, they didn't come to the Court

11 asking, hey, give me the money or make me whole again,

12 restore the money that I've asked for.  That's usually what

13 I see and that's not usually relief I can grant, other than

14 I can grant restitution.  Most of the time it's not ever

15 going to get paid.

16     What's unique in this case is victim after victim in

17 the statements and the ones that spoke today as well

18 basically said protect society, please protect society

19 from -- if I let you back out, you're going to continue to

20 do this criminal conduct.  That's the message I heard

21 throughout all the victim statements and their statements

22 today, and that is something I just haven't seen in my other

23 fraud cases.  Usually people want to be made whole, and

24 that's not what was happening here.

25     I've also -- in looking at the victim statements,

89

1      there's a lot of -- and I'm trying to think.  It was -- I

2      think she spoke today, Ms. Dyas, hers was remarkable in the

3      sense that her commenting on the complete failure of what

4      she believed was the justice system in not listening.  Of

5      course, she had multiple statements in there and that's the

6      constant theme that I have seen throughout.

7           Also, I look at this as really extreme conduct.  I know

8      Mr. Arrambide tried to say it's not sophisticated.  Just

9      listening to the victim statements illustrates how

10     sophisticated your system of fraud was, and it's what you've

11     been doing apparently for 25 years.  I mean, it's been going

12     on for a long, long time.

13          So from the Court's perspective -- oh, also, the

14     Government does assert the reasons and this is also

15     justification, because of the conduct that is getting

16     dismissed because of your plea agreement, the Court can

17     consider that also in analyzing the justification for an

18     upward variance.

19          But for the Court, the bottom line for the Court is I

20     have full belief that if you get out of jail, you're going

21     to commit these same crimes again.  That's what your history

22     and your pattern has been.  All the Court can do is try to

23     protect society from your criminal acts, provide adequate

24     punishment for the entirety of your conduct.  And so in that

25     vein, the Court has to do what I believe is the appropriate

90

1    sentence in this case and that is the maximum sentence

2    allowed under the law.

3              AUDIENCE MEMBER:  Yes.

4              THE COURT:  And I am going to impose the maximum

5    sentence that the statute allows for me.

6         I would say, Mr. Alldred, that I deal with other kinds

7    of cases in situations where I have to decide whether I

8    have -- it's up to life and I'm allowed to consider that,

9    and I have people that I consider and say should I ever let

10   that person ever out again.  You would be one of those

11   people if I had that option.  That's not my option in this

12   case because of what you pled guilty to and what I've

13   accepted.  So for those reasons, I will now impose sentence.

14        Pursuant to the Sentencing Reform Act of 1984, having

15   considered the factors noted in 18 USC Section 3553(a) and

16   having consulted the advisory Sentencing Guidelines, it is

17   the judgment of the Court the Defendant is hereby committed

18   to the custody of the Bureau of Prisons to be imprisoned for

19   a total -- well, I didn't do the math -- for a total term of

20   288 months.

21        The term consists of 24 months on count three, 24

22   months on count four and 240 months on count six of the

23   superseding indictment, all to be served consecutively,

24   which is the max on each of the -- the aggravated identity

25   theft counts and then 20 years on count six.

1    This sentence is within the advisory guideline range

2 that is greater than 24 months, and this specific sentence

3 is imposed after consideration of the factors set forth in

4 18 USC Section 3553(a).

5    The Court recommends to the Bureau of Prisons you

6 receive appropriate mental health treatment while you're

7 imprisoned.

8    The Court also recommends to the Bureau of Prisons you

9 be considered for drug treatment while you're imprisoned.

10    While incarcerated it's recommended you participate in

11 the Inmate Financial Responsibility Program at a rate to be

12 determined by the Bureau of Prisons' staff in accordance

13 with the requirements of the Inmate Financial Responsibility

14 Program.

15    It's further ordered that you will pay restitution

16 totalling $254,892.41 to the victims listed in paragraph 38

17 and 39 of the Presentence Report, which is due and payable

18 immediately.

19    The Court finds you don't have the ability to pay a

20 fine and I waive the fine in this case.

21    The Court also finds you don't have the ability to pay

22 interest and I'll waive the interest requirement in this

23 case.

24    It is ordered that you pay the United States a special

25 assessment of $300, which is due and payable immediately,

92

1    which is $100 per each of the counts.

2         Upon release from imprisonment you shall be placed on

3    supervised release for a term of three years.  This term

4    consists of a term of one year on count three, one year on

5    count four and three years on count six, all such terms to

6    run concurrently.  And this is necessary to monitor your

7    finances as well as any travel that you would have.

8         Within 72 hours of release from the custody of the

9    Bureau of Prisons, you shall report in person to the

10   probation office in the district to which you're released.

11        And you shall not commit another federal, state or

12   local crime, and you shall comply with the standard

13   conditions that have been adopted by the Court.  In

14   addition, you must comply with the mandatory and special

15   conditions and instructions that have been set forth in your

16   Presentence Report.

17        Also, I would note that in considering your sentence,

18   I've looked at the issue of what is the appropriate

19   sentence, so even if I'm wrong on all the objections and I'm

20   totally wrong on those -- I think I'm right, but even if I'm

21   wrong, this is the sentence that I would impose and I

22   believe -- I wish I could go higher, based on your

23   systematic fraud you have committed on so many people.  The

24   madness has to stop and all I can do -- I can't solve -- I

25   can't get them their money back.  I can't give them any

 1   other solace, but all I can do is protect society for as

 2   long as I can do so, so that's what I'm doing.  And so I

 3   would say that even if I'm wrong on the objections, this is

 4   the sentence I would impose, the maximum allowed under the

 5   law.

 6          Then I know, Mr. Arrambide, you mentioned about the

 7   Enron case.  I wasn't the judge in the Enron case, so that's

 8   all I would say is that if I had been the judge, maybe

 9   something would be different, but I don't know.  I don't

10   know anything about the underlying facts of that Presentence

11   Report but --

12          Now, sir, you have the right to appeal your conviction

13   if you believe your guilty plea was somehow unlawful or

14   involuntary, or if there was some other fundamental defect

15   in the proceedings not waived by your guilty plea.

16          You have a statutory right to appeal your sentence

17   under certain circumstances, particularly if you believe

18   your sentence is contrary to law.

19          However, you have waived some of these rights as part

20   of your plea agreement or you've entered a plea agreement

21   and waived certain rights to appeal your conviction and your

22   sentence.

23          With the exception of the grounds reserved in your plea

24   agreement, you have waived any right to appeal in this case.

25   Such waivers are generally enforceable, but if you believe

1    the waiver is not enforceable, you need to present that

2    theory to the Appellate Court.

3        With few exceptions, any notice of appeal must be filed

4    within 14 days of the judgment being entered in this case.

5    If you're unable to pay the costs of the appeal, you can

6    apply for leave to appeal in forma pauperis, which is

7    without payment of fees.  If you so request assistance, the

8    clerk of the court will prepare and file a notice of appeal

9    on your behalf.

10       Your Presentence Report is already part of the record.

11   It's under seal.  It will remain under seal unless needed

12   for purposes of appeal.

13       And then are there other charges to dismiss based on

14   the plea agreement?

15           MR. TATUM:  Yes, Your Honor.  The Government would

16   move to dismiss the remaining counts in the superseding

17   indictment.

18           THE COURT:  Okay.  I'll grant that request.

19       Then, Mr. Arrambide, I didn't ask you.  Is there any

20   geographic location you would like me to include in the

21   judgment?

22           MR. ARRAMBIDE:  The State of Minnesota, Your Honor.

23           THE COURT:  Okay.  It's not binding on the Bureau of

24   Prisons, but I will put in my judgment and recommend to the

25   Bureau of Prisons for Minnesota.

95

1          Anything further from the Government?

2               MR. TATUM:  No, Your Honor.

3               THE COURT:  Anything further from defense?

4               MR. ARRAMBIDE:  Your Honor, that recommendation for

5     mental health treatment.

6               THE COURT:  I believe I said that.  I think --

7               MR. ARRAMBIDE:  I'm getting an indication you did,

8     Your Honor, so I'll take that as a --

9               THE COURT:  I believe I did, so if there's nothing

10    further, then the Court will be in recess until 1:00 o'clock

11    when we resume our bench trial.

12

13

14

15

16

17

18    I certify that the foregoing is a correct transcript from

19    the record of proceedings in the above-entitled matter.

20

21    /s/_____          _____

      Jan Mason                         Date

22

23

24

25